# 22-1242(L)

**22-2550(CON)**

*To Be Argued By*:
MATTHEW PODOLSKY

## United States Court of Appeals

### FOR THE SECOND CIRCUIT
### Docket No. 22-1242(L), 22-2550(CON)

◄━━━►

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

MICHAEL AVENATTI,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA

MATTHEW PODOLSKY,
ROBERT SOBELMAN,
ANDREW ROHRBACH,
HAGAN SCOTTEN,
  *Assistant United States Attorneys,*
        *Of Counsel.*

DAMIAN WILLIAMS,
*United States Attorney for the
Southern District of New York,
Attorney for the United States
        of America.*
One St. Andrew's Plaza
New York, New York 10007
(212) 637-2200

# TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A. The Government's Case . . . . . . . . . . . . . . . 3

        1. Stormy Daniels's Retention of Michael Avenatti . . . . . . . . . . . . . . . . . . . . . . . . 4

        2. Avenatti's Financial Condition . . . . . . . 5

        3. Stormy Daniels's Book Deal . . . . . . . . . 5

        4. Avenatti's Theft of the Second Advance Payment . . . . . . . . . . . . . . . . . . . . . . . . 8

        5. Avenatti's Concealment of the Theft of the Second Advance Payment . . . . . . . 10

        6. Avenatti's Theft of the Third Advance Payment . . . . . . . . . . . . . . . . . . . . . . . . 13

        7. Avenatti's Concealment of the Theft of the Third Advance Payment . . . . . . . . 14

        8. Daniels's Discovery of the Fraud . . . . 15

    B. The Defense Case, Rule 29 Motion, and Verdict . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

ARGUMENT:

POINT I—The District Court Correctly Instructed the Jury Regarding the Professional Duties of Attorneys . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

PAGE

A. Relevant Facts . . . . . . . . . . . . . . . . . . . . . . .  19

B. Applicable Law . . . . . . . . . . . . . . . . . . . . . .  24

C. Discussion . . . . . . . . . . . . . . . . . . . . . . . . .  25

   1. The Challenged Instructions Were
      Correct . . . . . . . . . . . . . . . . . . . . . . . . . .  25

   2. Any Error Was Harmless . . . . . . . . . .  31

POINT II—The District Court Correctly Instructed the
Jury on the Duty to Deliberate. . . . . . . . . . . . .  32

A. Relevant Facts . . . . . . . . . . . . . . . . . . . . . . .  32

B. Applicable Law . . . . . . . . . . . . . . . . . . . . . .  37

C. Discussion . . . . . . . . . . . . . . . . . . . . . . . . .  38

POINT III—The The District Court Correctly
Calculated the Loss Amount. . . . . . . . . . . . . . .  45

A. Relevant Facts . . . . . . . . . . . . . . . . . . . . . . .  45

B. Applicable Law . . . . . . . . . . . . . . . . . . . . . .  47

C. Discussion . . . . . . . . . . . . . . . . . . . . . . . . .  48

   1. The Credit Against Loss Rule Does Not
      Apply. . . . . . . . . . . . . . . . . . . . . . . . . . .  48

   2. Any Error Was Harmless . . . . . . . . . .  53

PAGE

POINT IV—Avenatti's Challenge to the Sequence in which Restitution Will Be Paid Is Meritless and Waived . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

    A.  Relevant Facts . . . . . . . . . . . . . . . . . . . . . . . 54

    B.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

## TABLE OF AUTHORITIES

*Cases*:

*Allen v. United States*,
    164 U.S. 492 (1896) . . . . . . . . . . . . . . . . . . . . . . . 37

*Anderson v. Bessemer City*,
    470 U.S. 564 (1985) . . . . . . . . . . . . . . . . . . . . . . . 47

*Gall v. United States*,
    552 U.S. 38 (2007) . . . . . . . . . . . . . . . . . . . . . . . . 47

*Hernandez v. New York*,
    500 U.S. 352 (1991) . . . . . . . . . . . . . . . . . . . . . . . 47

*Huddleston v. United States*,
    485 U.S. 681 (1988) . . . . . . . . . . . . . . . . . . . . . . . 28

*Lowenfield v. Phelps*,
    484 U.S. 231 (1988) . . . . . . . . . . . . . . . . . . . . 38, 44

*McKnight v. State Bar*,
    53 Cal. 3d 1025 (1991) . . . . . . . . . . . . . . . . . . 23, 28

*Neder v. United States*,
    527 U.S. 1 (1999) . . . . . . . . . . . . . . . . . . 25, 32, 49

*People v. Stein*,
　　156 Cal. Rptr. 299 (Cal. Ct. App. 1979). . . . . . . 28

*Smalls v. Batista*,
　　191 F.3d 272 (2d Cir. 1999) . . . . . . . . . . . . . . . 40

*Spears v. Greiner*,
　　459 F.3d 200 (2d Cir. 2006) . . . . . . . . . . . . . 39, 41

*United States v. Acevedo*,
　　882 F.3d 251 (1st Cir. 2018). . . . . . . . . . . . . . . 29

*United States v. Baker*,
　　262 F.3d 124 (2d Cir. 2001) . . . . . . . . . . . . *passim*

*United States v. Baldeo*,
　　615 F. App'x 26 (2d Cir. 2015) . . . . . . . . . . . . . 43

*United States v. Barnes*,
　　125 F.3d 1287 (9th Cir. 1997) . . . . . . . . . . . . . . 52

*United States v. Barone*,
　　114 F.3d 1284 (1st Cir. 1997). . . . . . . . . . . . . . . 37

*United States v. Blitz*,
　　151 F.3d 1002 (9th Cir. 1998) . . . . . . . . . . . . . . 51

*United States v. Bodnar*,
　　37 F.4th 833 (2d Cir. 2022) . . . . . . . . . . . . . . . . 56

*United States v. Byors*,
　　586 F.3d 222 (2d Cir. 2009) . . . . . . . . . . . . . . . . 51

*United States v. Calderon*,
　　944 F.3d 72 (2d Cir. 2019) . . . . . . . . . . . . . . . . . 39

*United States v. Carr*,
　　880 F.2d 1550 (2d Cir. 1989) . . . . . . . . . . . . . . . 24

PAGE

*United States v. Cavera,*
550 F.3d 180 (2d Cir. 2008) . . . . . . . . . . . . . . . . 47

*United States v. Cavin,*
39 F.3d 1299 (5th Cir. 1994) . . . . . . . . . . . . . . . 29

*United States v. Crispo,*
306 F.3d 71 (2d Cir. 2002) . . . . . . . . 38, 40, 41, 42

*United States v. Dhinsa,*
243 F.3d 635 (2d Cir. 2001) . . . . . . . . . . . . . . . . 32

*United States v. Fareri,*
712 F.3d 593 (D.C. Cir. 2013). . . . . . . . . . . . . . . 56

*United States v. Fumo,*
655 F.3d 288 (3d Cir. 2011) . . . . . . . . . . 48, 51, 52

*United States v. Gansman,*
657 F.3d 85 (2d Cir. 2011) . . . . . . . . . . . . . . . . . 25

*United States v. Gonzalez,*
407 F.3d 118 (2d Cir. 2005) . . . . . . . . . . . . . . . . 47

*United States v. Haynes,*
729 F.3d 178 (2d Cir. 2013) . . . . . . . . . . . . . . . . 40

*United States v. Jass,*
569 F.3d 47 (2d Cir. 2009) . . . . . . . . . . . . . . . . . 53

*United States v. Jennings,*
471 F.2d 1310 (2d Cir. 1973) . . . . . . . . . . . . . . . 43

*United States v. Kellington,*
217 F.3d 1084 (9th Cir. 2000) . . . . . . . . . . . . . . 29

*United States v. Kelly,*
888 F.2d 732 (11th Cir. 1989) . . . . . . . . . . . . . . 30

PAGE

*United States v. Klein,*
   543 F.3d 206 (5th Cir. 2008) . . . . . . . . . . . . . . . . 53

*United States v. Kyles,*
   601 F.3d 78 (2d Cir. 2010) . . . . . . . . . . . . . . 55, 56

*United States v. Lochard,*
   555 F. App'x 94 (2d Cir. 2014) . . . . . . . . . . . . . . 56

*United States v. Martinez,*
   446 F.2d 118 (2d Cir. 1971) . . . . . . . . . . . . . . . . 43

*United States v. McCracken,*
   488 F.2d 406 (5th Cir. 1974) . . . . . . . . . . . . . 25, 26

*United States v. McDonald,*
   759 F.3d 220 (2d Cir. 2014) . . . . . . . . . . . . . 38, 40

*United States v. Melhuish,*
   6 F.4th 380 (2d Cir. 2021) . . . . . . . . . . . . . . . . . 39

*United States v. Mulder,*
   273 F.3d 91 (2d Cir. 2001) . . . . . . . . . . . . . . 24, 29

*United States v. O'Connor,*
   580 F.2d 38 (2d Cir. 1978) . . . . . . . . . . . . . . . . . 43

*United States v. Olano,*
   507 U.S. 725 (1993). . . . . . . . . . . . . . . . . . . . . . . . 57

*United States v. Pirro,*
   9 F. App'x 45 (2d Cir. 2001). . . . . . . . . . . . . . 42, 45

*United States v. Radtke,*
   415 F.3d 826 (8th Cir. 2005) . . . . . . . . . . . . . . . . 51

*United States v. Robinson,*
   560 F.2d 507 (2d Cir. 1977) . . . . . . . . . . . . . . . . 43

PAGE

*United States v. Roman*,
  870 F.2d 65 (2d Cir. 1989) . . . . . . . . . . . . . . . . . 43

*United States v. Rowland*,
  826 F.3d 100 (2d Cir. 2016) . . . . . . . . . . . . . . . . 51

*United States v. Roy*,
  783 F.3d 418 (2d Cir. 2015) . . . . . . . . . . . . . . . . 24

*United States v. Ruggiero*,
  928 F.2d 1289 (2d Cir. 1991) . . . . . . . . . . . . 40, 43

*United States v. Skelos*,
  707 F. App'x 733 (2d Cir. 2017) . . . . . . . . . . 27, 28

*United States v. Snype*,
  441 F.3d 119 (2d Cir. 2006) . . . . . . . . . . . . . . . . 31

*United States v. Thomas*,
  116 F.3d 606 (2d Cir. 1997) . . . . . . . . . . . . . . . . 34

*United States v. Tourine*,
  428 F.2d 865 (2d Cir. 1970) . . . . . . . . . . . . . . . . 30

*United States v. Vargas-Cordon*,
  733 F.3d 366 (2d Cir. 2013) . . . . . . . . . . . . . *passim*

*United States v. Watts*,
  519 U.S. 148 (1997). . . . . . . . . . . . . . . . . . . . . . 47

*United States v. White*,
  552 F.3d 240 (2d Cir. 2009) . . . . . . . . . . . . . . . . 24

*United States v. Wilkerson*,
  361 F.3d 717 (2d Cir. 2004) . . . . . . . . . . . . . . . . 24

PAGE

*Statutes, Rules & Other Authorities:*

18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . . . . . . . 47, 54

Fed. R. Crim. P. 52(a) . . . . . . . . . . . . . . . . . . . . . . 25

U.S.S.G. § 2B1.1 . . . . . . . . . . . . . . . . . . . 48, 49, 50, 51

# United States Court of Appeals

## FOR THE SECOND CIRCUIT
### Docket Nos. 22-1242(L), 22-2550(CON)

---

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

MICHAEL AVENATTI,

*Defendant-Appellant.*

---

## BRIEF FOR THE UNITED STATES OF AMERICA

---

## Preliminary Statement

Michael Avenatti appeals from a judgment of conviction entered on June 2, 2022, and an order of restitution entered on September 23, 2022, in the Southern District of New York, following a two-week trial before the Honorable Jesse M. Furman, United States District Judge, and a jury.

Indictment 19 Cr. 374 (JMF) (the "Indictment") was filed on May 22, 2019, in two counts. Count One charged Avenatti with wire fraud, in violation of 18 U.S.C. § 1343. Count Two charged Avenatti with aggravated identity theft, in violation of 18 U.S.C. § 1028A.

Trial commenced on January 20, 2022, and ended on February 4, 2022, when Avenatti was convicted of both counts.

On June 2, 2022, Judge Furman sentenced Avenatti principally to an aggregate term of 48 months' imprisonment, and deferred a final determination as to restitution.

On September 23, 2022, Judge Furman entered an order, with Avenatti's consent, imposing $148,750 in restitution.

Avenatti is serving his sentence.

### Statement of Facts

Between the summer of 2018 and February 2019, Michael Avenatti, an attorney, defrauded his client, Stormy Daniels.[1] During the course of representing Daniels, Avenatti assisted her in securing a book contract. Avenatti then stole a significant portion of Daniels's advance on that contract. In order to take the money without Daniels's knowledge, Avenatti sent a

---

[1]  Daniels's legal name is Stephanie Clifford, but she prefers to be referred to by her stage name, Stormy Daniels. (A. 287-88 (Tr. 883-84)). "Br." refers to Avenatti's brief on appeal; "A." and "SPA" refer to the appendix and special appendix filed with that brief, respectively; "Tr." refers to the trial transcript; and "Dkt." refers to an entry on the District Court's docket for this case. Unless otherwise noted, case text quotations omit internal quotation marks, citations, and previous alterations.

fraudulent letter on which Daniels's signature had been forged, instructing Daniel's literary agent to send book advance payments to a bank account controlled by Avenatti, rather than to Daniels. Avenatti then took the money, using it for his own purposes, including to pay employees of his law firm and a coffee business he owned, to make payments to individuals with whom Avenatti had personal relationships, to make a car payment, and to pay for hotels, airfare, meals, car services, and dry cleaning. When Daniels inquired about the status of her advance fees, Avenatti repeatedly lied to Daniels, including by claiming that the book's publisher had refused to pay and that he was negotiating with the publisher on Daniels's behalf, when, in fact, Avenatti had already received the fees and spent them himself.

Avenatti engaged in this fraud twice. Initially, he stole an advance payment of $148,750. When Daniels pressed Avenatti on why she had not received the payment and threatened to contact the publisher, Avenatti obtained a personal loan and replaced the stolen funds. Shortly thereafter, he stole an additional payment of $148,750, which he never repaid.

## A. The Government's Case

At trial, bank records and other documents demonstrated Avenatti's misappropriation of Daniels' funds, as well as Avenatti's own desperate financial condition. Avenatti's lies to Daniels and her literary agent were captured in emails and in text messages recovered from Avenatti's iCloud account. Avenatti's fraud was established by straightforward comparison

between the bank records and the written representations Avenatti made to Daniels. In addition to these records, the Government introduced the testimony of ten witnesses, including Daniels, Daniels's publisher, Daniels's literary agent, a friend of Avenatti whom Avenatti approached for a loan that Avenatti used to pay back some of the money he stole from Daniels, and Avenatti's former paralegal and office manager.

### 1. Stormy Daniels's Retention of Michael Avenatti

Stormy Daniels is a writer, director, actress, model, dancer, and adult film performer. (A. 288 (Tr. 885)). In February 2018, Daniels sought out an attorney to provide advice regarding her ability to withdraw from a nondisclosure agreement that she had signed with former President Donald Trump. (A. 288 (Tr. 886)). Another attorney referred Daniels to Avenatti, and on February 27, 2018, Daniels retained him. (A. 162 (Tr. 386-87), 289-91 (Tr. 890-97), 661-62).

Before signing a retainer agreement, Daniels met with Avenatti twice. During the first meeting, Daniels explained that she did not have the resources to pay a large retainer or deposit, and was concerned about finding a lawyer whose services she could afford. (A. 289 (Tr. 890)). During the second meeting, Avenatti assured Daniels that she need pay only $100 to retain him, and that he would obtain any additional compensation by creating a crowd-funded legal defense fund as well as taking a portion of any winnings in an anticipated lawsuit against President Trump. (A. 289 (Tr. 889-90)). Daniels mentioned that she was

interested in obtaining a deal to publish a memoir, and Avenatti stated that they could discuss compensation for any assistance he provided on that project at a later time. (A. 289 (Tr. 890-91)). The retainer agreement that Daniels signed reflected the same terms: (a) Daniels would make a single $100 payment; (b) hourly fees and costs could be drawn from a legal defense fund, if one were created; and (c) if Avenatti assisted Daniels in obtaining a book deal, he would be entitled to a percentage of the proceeds to be agreed upon later by Avenatti and Daniels. (A. 661).

### 2. Avenatti's Financial Condition

Notwithstanding Avenatti's willingness to represent Daniels for $100 and possible future gain, by the time that Avenatti took on Daniels as a client, Avenatti's law firm was failing financially. (A. 162 (Tr. 387-88), 169 (Tr. 413-15)). The firm could not pay its bills, including payroll, employee health insurance premiums, and other expenses, and had been evicted from its offices for failure to pay rent. (A. 162 (Tr. 387-88), 170 (Tr. 418-20), 183 (Tr. 471); *see also* A. 250 (Tr. 734)). Avenatti was also facing dire personal economic circumstances. (A. 171 (Tr. 421)). He had resorted to using the few funds his law firm had left to pay his personal expenses. (A. 170-71 (Tr. 420-21)).

### 3. Stormy Daniels's Book Deal

In March 2018, Avenatti, on Daniels's behalf, met with a literary agent named Lucas Janklow to discuss the possibility of selling a book to be written by Daniels. (A. 91-92 (Tr. 104-05)). Although Janklow came to represent Daniels as her literary agent, his

communications with her were conducted almost entirely through Avenatti. Over the course of the next year, during which Daniels's book was written and published, Janklow spoke with Daniels directly approximately twenty or twenty-five times, whereas he typically spoke to Avenatti multiple times each day. (A. 92 (Tr. 105-06)).

Daniels ultimately signed a retainer agreement with Janklow, pursuant to which Janklow would represent Daniels in obtaining a deal to publish her proposed book in exchange for 15% of the proceeds obtained from the publisher. (A. 92-93 (Tr. 106-10), 781-82). Avenatti separately, and without Daniels's knowledge, requested that Janklow pay Avenatti a referral fee of 2.5% of the proceeds from the publisher. (A. 96 (Tr. 122-23), 296 (Tr. 917-18)).

Janklow ultimately helped Daniels secure a deal with St. Martin's Press to publish her book. (A. 93 (Tr. 110), 745-80). Under the terms of the deal, Daniels was guaranteed a total payment, generally referred to as the advance payment or advance, of $800,000. (A. 94 (Tr. 113), 747). The advance was divided into four payments, each to be made upon the fulfillment of particular requirements. First, St. Martin's Press would make a payment of $250,000 upon the signing of the book deal. (A. 94 (Tr. 115), 747, 1140). Second, St. Martin's Press would make a payment of $175,000 upon its acceptance of a draft manuscript. (A. 94 (Tr. 116), 747, 1140). Third, St. Martin's Press would make a payment of $175,000 upon the publication of the book, or six months from delivery of the manuscript if the book were not published, provided that

Daniels made certain efforts to publicize the book. (A. 94 (Tr. 116), 747, 1140). Fourth, St. Martin's Press would make a payment of $200,000 upon the later of six months from the publication of the book or twelve months from delivery of the manuscript if the book were not published, provided again that Daniels complied with requirements to publicize the book. (A. 95 (Tr. 117), 747, 1140). All four payments were due to Daniels regardless of whether the book was published or sold any copies, although Daniels was able to earn additional compensation beyond the advance if the book sold well enough. (A. 95 (Tr. 117-18)).

All four installments of the advance were to be paid from St. Martin's Press to Janklow, who would take his 15% commission and remit the remainder of the installment to Daniels. (A. 91 (Tr. 103-04)). So that Janklow could send Daniels her advance payments, Avenatti provided Janklow the account information for Daniels's business checking account. (A. 97 (Tr. 127-28), 294 (Tr. 909-10), 792). On April 11, 2018, Daniels signed the contract with St. Martin's Press, St. Martin's Press wired $250,000 to Janklow, and Janklow wired $212,500 ($250,000 minus the 15% commission) to Daniels. (A. 97-98 (Tr. 127-31), 744, 788).

After Daniels received the first advance installment, she contacted Avenatti by text message to convey her excitement at having been paid to write a book. (A. 294-95 (Tr. 911-12), 668). Daniels also spoke to Avenatti by phone that day. (A. 295 (Tr. 912-13)). During that call, Avenatti congratulated Daniels and told her that he would never take any remuneration from

her relating to the book, which he told her she had earned. (A. 295 (Tr. 913)). On multiple other occasions, Avenatti—who had garnered substantial fame through his representation of Daniels (A. 92 (Tr. 105)) —reiterated that he would not take any money from Daniels's book payments because she deserved the money for her story, and said that he would instead make money from lawsuits against Trump and through crowd funding (A. 295 (Tr. 914)).

### 4. Avenatti's Theft of the Second Advance Payment

On July 29, 2018, after Daniels had submitted a manuscript of her book to her publisher, but before the draft had been accepted, Daniels sent a text message to Avenatti asking when she would receive her second advance installment. (A. 296 (Tr. 918-19), 670, 1145). Avenatti responded that he thought she "would get a payment in the next two weeks." (A. 671, 1145).

At or around this time, Avenatti began urging Janklow to obtain the second installment from St. Martin's Press as soon as possible, claiming that Daniels needed the money. (A. 100 (Tr. 138-39)). Janklow spoke only to Avenatti about Daniels's purported need for money because Avenatti instructed Janklow not to speak directly to Daniels about money. (A. 100 (Tr. 140)).

At Avenatti's insistence, on July 31, 2018, Janklow sent an email to St. Martin's Press stating that "we need the $," and requesting the list of tasks that needed to be completed to obtain the money "ASAP." (A. 799; *see also* A. 99-101 (Tr. 136-42)). Later that

day, Elizabeth Beier from St. Martin's Press emailed Avenatti and Janklow, stating that the second installment of $175,000 could be paid once certain items relating to the book were received by St. Martin's Press. (A. 101-02 (Tr. 144-45), 801, 1145). Approximately an hour and half later, Avenatti sent Janklow an email containing new bank account information—this time for a client trust account in the name of Avenatti's law firm, controlled by Avenatti—for Janklow to use in lieu of the bank account that Daniels had previously instructed Avenatti to use. (A. 102-03 (Tr. 148-49), A. 813, 1145). Janklow responded to Avenatti's email by text message, explaining that Janklow would need something from Daniels confirming that Janklow could send her book payment to the new account, because normally Janklow would pay only "contracted parties" and would not entertain a request to change banking information in this manner. (A. 103-04 (Tr. 151-53), A. 817, 1145).

The following day, August 1, 2018, Avenatti sent an email to Janklow attaching a letter to Janklow's firm, apparently from Daniels and bearing her signature. (A. 104 (Tr. 153-56), 818-19, 1146). The letter instructed Janklow to route future book payments to the new account provided by Avenatti the previous day. (A. 104 (Tr. 153-56), 818-19, 1146). Avenatti did not ask permission from Daniels to send this letter, nor did he obtain the signature on the letter from Daniels. (A. 316 (Tr. 997)). Instead, Avenatti drafted the letter and had his office manager copy Daniels's signature from her retainer agreement with Avenatti onto the letter purporting to provide authorization for Janklow

to remit payments to the new account. (A. 168-69 (Tr. 411-13), 819, 1128).

Shortly thereafter, Janklow sent two wires totaling $148,750—the total amount due to Daniels on the second installment after Janklow took his 15% commission—to the new bank account provided by Avenatti. (A. 789-90, 1136, 1142, 1146). Because of the urgency with which Avenatti had pressed for the payment, Janklow sent the money before St. Martin's Press had made the advance payment to Janklow. (A. 105 (Tr. 157-60)).

After the money was received into the so-called client trust account, Avenatti did not relay the money to Daniels. Instead, Avenatti transferred the money to other accounts he controlled, and spent it. (A. 235-37 (Tr. 674-83), 1137).

### 5. Avenatti's Concealment of the Theft of the Second Advance Payment

Shortly after taking Daniels's second advance payment, Avenatti began a months-long effort to mislead Daniels concerning the whereabouts of her money. On August 9, 2018, which was eleven days after Avenatti had told Daniels that she would get her second installment "in the next two weeks" (A. 671, 1145-46), and six days after Avenatti had received the full $148,750 owed to Daniels for the second installment (A. 789-90, 1146), Daniels asked Avenatti again by text message, "when do we get paid?" (A. 821, 1146). More than two weeks later, on August 27, 2018, having still not received the second installment and unaware that it had been diverted by Avenatti, Daniels again messaged

Avenatti, writing that the publishers "still have not paid me despite final version being submitted a while ago." (A. 679, 1146). This time, Daniels threatened to go directly to the publisher herself, telling Avenatti that she was "going to email Elizabeth [Beier] about it now." (A. 679, 1146; *see also* A. 297 (Tr. 922-23)). It does not appear that Daniels emailed Beier at that moment; instead Avenatti told Daniels that St. Martin's Press had not made the second payment and that he was working on obtaining it, while not revealing that he had taken it himself. (A. 297-98 (Tr. 923-25), 680).

The weekend after Daniels threatened to contact the publisher directly, Avenatti attended a convention in Las Vegas. (A. 248 (Tr. 726-27)). During that weekend, Avenatti spent time with a friend named Sean Macias. (A. 248 (Tr. 726-27)). Macias observed that Avenatti was acting "a little more agitated than he normally was" and "a little bit needy." (A. 248 (Tr. 728)). During a party on Friday evening, Avenatti appeared "melancholy," and told Macias that Daniels was "going crazy" because the publisher for her book had not paid—even though, in truth, St. Martin's Press was current on its payments to Daniels and Avenatti had misappropriated the most recent installment. (A. 248-49 (Tr. 728-29, 732-33)).

Four days later, Avenatti appeared in Macias's office and again seemed "[a]gitated." (A. 249-50 (Tr. 733-34)). Avenatti told Macias that Avenatti's law firm was about to be evicted and that he needed money for payroll, asked Macias for a $250,000 loan, and said that he needed the money immediately. (A. 250 (Tr. 734-36)). Macias refused to provide the loan, but agreed to

introduce Avenatti to a friend who might be able to make the loan. (A. 250 (Tr. 736-37)). Macias and Avenatti went to Macias's friend's house, where Avenatti told Macias's friend that he needed a loan by the next morning, but expected to receive money in September or October, from which he could repay the loan. (A. 251-52 (Tr. 741-42)).

The next morning, Macias's friend responded that he would not provide the loan, and Avenatti became upset. (A. 252 (Tr. 745), 1123). At Avenatti's request, Macias contacted a second friend, who agreed to provide Avenatti with a loan of $250,000. (A. 253-54 (Tr. 746-50), 1124).

On September 5, 2018, Avenatti received a wire from Macias's second friend in the amount of $250,000. (A. 1086, 1091, 1147). That same day, Daniels again messaged Avenatti to express frustration that she had not received the second advance payment—which she believed the publisher had not paid—writing, "I did not get paid today. I am not fucking happy. They are in breach of contract by about 4 weeks." (A. 683, 1147).

Also on September 5, 2018, Avenatti instructed his office manager to purchase a cashier's check in the amount of $148,750—the amount Daniels was owed on the second book payment, which Avenatti had stolen —drawing on the funds he had received that day from Macias's friend, and to deposit the check into Daniels's actual bank account. (A. 172-73 (Tr. 428-29), 859-60, 1147). By having his office manager purchase a cashier's check, and then deposit it into Daniels's account, rather than wire or transfer the money to Daniels's account or deposit a standard counter check, Avenatti

made it so that Daniels could not identify from what account the money was drawn. Avenatti told Daniels that St. Martin's Press had mailed him a cashier's check, and that he would have it deposited in Daniels's account. (A. 299 (Tr. 928-99)). That claim was at odds with the facts, specifically that Janklow had received the payment from the publisher and wired the money to the account controlled by Avenatti, Avenatti had taken that money, and the money that was used to purchase the cashier's check came out of the loan from Macias' friend. At the time, however, Daniels accepted Avenatti's explanation, and remained ignorant that Avenatti had diverted the second book payment to himself. (*See* A. 299 (Tr. 929)).

### 6. Avenatti's Theft of the Third Advance Payment

Approximately a week after using the loan from Macias's friend to hide that he had stolen Daniels's second book payment, Avenatti began plotting to steal her third book payment, which would be due from St. Martin's Press upon the book's publication (or six months from delivery of the manuscript if the book was not published). (A. 94 (Tr. 116), 747, 1140).

In September 2018, although Daniels's book had not yet been published, Avenatti spoke to Janklow and urged Janklow to convince St. Martin's Press to make the third book payment early, claiming that Daniels was facing financial difficulties, among other things. (A. 106-07 (Tr. 164-68)). At Avenatti's direction, Janklow did not speak directly to Daniels about the matter. (A. 107 (Tr. 168)). Instead, Janklow emailed

Beier and another representative of St. Martin's Press to request early payment of the third installment, stating, among other things, that "I was speaking to Michael [Avenatti] earlier and he asked about the publication $," and that Daniels "has money problems all the time." (A. 106-07 (Tr. 164-68), 822, 1148).

St. Martin's Press agreed to make the third payment early, and sent the third installment, $175,000, to Janklow. (A. 107-08 (Tr. 168-69), 109 (Tr. 174), 374-75 (Tr. 1229-31), 786). On September 17, 2018, which was about two weeks before Daniels's book was published, Janklow sent Daniels's third payment of $148,750 ($175,000 less Janklow's commission) to the supposed client trust account that Avenatti controlled. (A. 109 (Tr. 174-75), 375 (Tr. 1231), 791, 1148).

Avenatti did not relay Daniels's third payment to her. Instead, over the next two weeks, Avenatti transferred the money to other law firm accounts that he controlled, and spent it, including on airfare, car services, food, hotel stays, personal care, and law firm expenses, and sent some of it to other clients or individuals with whom he had personal relationships. (A. 237-40 (Tr. 683-95), 1138-39).

### 7. Avenatti's Concealment of the Theft of the Third Advance Payment

On October 1, 2018, two days before publication of her book, Daniels—still believing Avenatti's representation that the second payment had been made late by St. Martin's Press, rather than taken by him—sent a text message to Avenatti, stating "Re: book payment . . . make sure they don't take 5 weeks like last time.

They were way late." (A. 691, 1148). Avenatti responded, "Got it on the book." (A. 692, 1148).

Between October 2, 2018, and the end of February 14, 2019, Daniels texted Avenatti at least twenty-five times to inquire about her third payment, which was then due because her book had been published. (A. 1149-59). Avenatti did not tell Daniels that he had already received (and spent) the payment; instead he claimed that he was working on obtaining it from St. Martin's Press. (A. 1149-59). Avenatti even told Daniels that he had threatened to sue St. Martin's Press. (A. 714, 1154). These claims were false, given that St. Martin's Press had made the payment, and Avenatti had taken it. (*See* A. 388-89 (Tr. 1283-84)).

Because she had been led to believe that St. Martin's Press was withholding her payment, Daniels from time to time attempted to contact Janklow or St. Martin's Press, either directly or through her manager. (A. 824-32, 1150-51, 1154, 1157, 1158). In order to prevent a conversation that would have led to Daniels discovering his theft, Avenatti instructed Janklow (who relayed the instructions to St. Martin's Press) not to respond to Daniels, claiming, among other things, that Daniels was confused and was seeking early payment of the fourth installment, and telling them that he (Avenatti) would deal with Daniels. (A. 110-13 (Tr. 177-192), 386-88 (Tr. 1272-83), 825, 830).

### 8. Daniels's Discovery of the Fraud

On February 15, 2019, Daniels again tried reaching her literary agent, Janklow, repeatedly calling and text messaging him. (A. 115 (Tr. 198-200), 833, 835-

36). Janklow did not answer Daniels, pursuant to Avenatti's instructions, but instead told Avenatti that Daniels was repeatedly contacting him. (A. 115 (Tr. 200), 833).

To assist Avenatti, who Janklow believed was speaking to Daniels to resolve what Janklow thought was confusion about her payments, Janklow sent Avenatti documentation demonstrating that each of the first three book payments had been made. (A. 116-17 (Tr. 202-06), 838-44). Eventually, Avenatti's instructions not to respond to Daniels began to make Janklow uncomfortable, and Janklow (who at the time believed Avenatti's claims that Daniels was mistaken about what was owed to her) wrote to Avenatti, "I understand your desire and ability to smooth this but it still does not make me comfortable about blanking a signed client with questions about money—[i]ll formed as they may be." (A. 833). In response, Avenatti asked Janklow not to speak to Daniels, and did so in a tone that was "[i]nsistent, urgent, [and] forceful." (A. 117-18 (Tr. 208-09)).

The following day, February 16, 2019, Daniels again tried to reach Janklow. (A. 117 (Tr. 205), 836, 845). In response, Janklow sent a text message to Avenatti, stating:

> Dude she just called me again—I have to be honest I am no longer comfortable with not communicating with her at all ever . . . she is a client of my firm, I have legal obligations to her and I have never behaved this way—there is clearly something off and as impulsive and impetuous

> as she is she's not as bad as some of my
> other clients.

(A. 845, 1162). Later that day, Janklow did speak to Daniels, who calmly explained that she had never received her third book payment and had been discussing the issue with Avenatti. (A. 118 (Tr. 211-12), 845). Janklow directed his assistant to provide Daniels with the same payment information he had sent to Avenatti the day before, documenting that the second and third payments had been paid on time (in fact, early) and sent to the account designated by Avenatti. (A. 118-19 (Tr. 212-13), 845).

On February 19, 2019, Janklow's assistant emailed Daniels the payment information—which revealed that what Avenatti had told Daniels about both the second and third payments was false, and which contained the letter in which Avenatti falsely claimed that Daniels had given permission to send her payments to a new bank account. (A. 846-52, 1164). A few hours later, Daniels sent text messages to Avenatti with a screenshot of the payment information for the third payment, stating, "I never received this payment that was sent to you. Last payment you gave me was #2 via a check you deposited on Sept. 5th . . . I didn't even know you had a trust account with my name on it." (A. 737-38, 1164). In response, Avenatti wrote, "Let me find out if we even received this payment." (A. 738, 1164). Daniels replied, "Here is the wire proof. You also waited over 30 days to give me payment #2. You've had payment #3 for over 5 months . . . ." (A. 738, 1164). Avenatti answered, "Let me find out what is going on." (A. 738, 1164).

Daniels never received the $148,750 that was owed on the third advance payment, and which Avenatti stole and spent. (A. 317 (Tr. 1002)).

## B. The Defense Case, Rule 29 Motion, and Verdict

Prior to the conclusion of the direct testimony of the Government's third witness (Avenatti's former paralegal and office manager), Avenatti exercised his right to represent himself and did so, with the benefit of his former attorneys as standby counsel, for the remainder of the trial. (A. 178-81 (Tr. 452-63)). Avenatti pressed his defense through examination of the Government's witnesses, as well as offering several documents, largely attempting to show that he expended extensive efforts on Daniels's behalf when he was her attorney, that Daniels could be difficult, including with respect to the manner in which she publicized the book, and that Daniels maintained an interest in the occult that some might find unusual or distasteful. (*See, e.g.*, A. 328-32 (Tr. 1044-60), 337-38 (Tr. 1079-83), 343 (Tr. 1106), 346 (Tr. 1116-18), 363 (Tr. 1186), 390 (Tr. 1289-91), 394-96 (Tr. 1306-15), 399 (Tr. 1324-27)).

At the conclusion of the Government's case, Avenatti moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29, contending, among other things, that the Government had not adduced sufficient evidence of his guilt on either count, that his conduct was within the scope of authority he held as Daniels's attorney, and that he was entitled under California law or his contract with Daniels to extract fees. (A. 408-09 (Tr. 1360-65)). Judge Furman denied the

motion. (A. 409 (Tr. 1364-65)). Avenatti renewed his motion at the conclusion of the defense case, and it was again denied. (A. 522 (Tr. 1607)).

The jury convicted Avenatti on both counts. (A. 582 (Tr. 1841-43)).

## ARGUMENT

## POINT I

### The District Court Correctly Instructed the Jury Regarding the Professional Duties of Attorneys

#### A.   Relevant Facts

Prior to trial, Avenatti made clear that he intended to argue that he had a good faith belief that the money he took from Daniels belonged to him. (*See* Dkt. 194 at 1; Dkt. 187 at 10). The Government, in turn, provided notice to Avenatti that it believed that certain professional duties of attorneys in California, where Avenatti was a member of the bar when he committed the conduct at issue, would be relevant to whether Avenatti engaged in a scheme to defraud and did so knowingly and intentionally. (*See* Dkt. 210 at 2). Accordingly, the Government requested that the District Court instruct the jury on certain professional obligations of attorneys, and notified Avenatti that if the District Court declined to provide those instructions, the Government would offer expert testimony on the matter. (*See* Dkt. 210 at 2). Specifically, the Government intended "to offer evidence showing, among other things, that the defendant did not, as would be

required by the rules governing the defendant's professional conduct, (1) enter into a written agreement for fees related to [Daniels]'s book deal, (2) provide an accounting of expenses to which he might purport to be entitled, (3) discuss with and provide written information to [Daniels] regarding any trust account created or funds purportedly held on [Daniels] behalf, or (4) communicate with [Daniels] with respect to important decisions concerning [Daniels]'s interest." (Dkt. 210 at 2).

In a pretrial order, Judge Furman precluded the Government from calling an expert on this subject, but stated that he would instruct the jury regarding applicable duties, if he found them relevant. (Dkt. 226 at 3-4). Judge Furman reserved judgment on relevance "pending trial and the charge conference." (Dkt. 226 at 4 n.2). During trial, the Government offered extensive evidence regarding what Avenatti did and did not tell Daniels about her expenses and actions Avenatti took to divert Daniels's money from an account he labeled as a trust account to pay his own expenses. (*See supra* at 8-18).

In light of this evidence, Judge Furman held that instructing the jury on an attorney's professional duties was "well justified," and "that the jury could consider them in evaluating whether the government has proved the first two elements of wire fraud," the existence of a scheme to defraud and the defendant's willful and knowing participation in that scheme with the intent to defraud. (A. 447 (Tr. 1515), 554 (Tr. 1735)). Judge Furman was also careful to limit the jury's use

of those instructions, explaining to the parties during the charge conference:

> I think my initial proposal made adequately clear that the jury could not rely on an ethical violation without more to find that those first two elements were met, that is to say that an ethical violation does not necessarily mean that there is a criminal violation, but that being said, in response to Mr. Avenatti's submission . . . I decided to underscore the point by reiterating it at the close of the instruction on professional duties in the manner that you have before you.

> So I thought it made sense to just leave no doubt about that and make sure that the jury adequately understands that . . . a lawyer can commit an ethical violation without having criminal intent.

(A. 447 (Tr. 1515-16)).

When he instructed the jury, Judge Furman carefully explained the relevance of his instructions on an attorney's duties, and the limited purpose for which the jury could use those instructions:

> Before we turn to the third and final element of wire fraud, I want to explain certain professional duties of lawyers that you may consider in connection with the first two elements of Count One.

> As you know, during most of the events relevant to this case, Mr. Avenatti

served as Ms. Clifford's lawyer. During that time, the defendant was a member of the California Bar and therefore, under California law owed certain duties to Ms. Clifford as his client. In considering the first two elements of Count One, you may consider whether the defendant breached any of these professional obligations to Ms. Clifford.

You should keep in mind that proof that the defendant violated one or more of his professional duties under California law does not, without more, mean that he committed wire fraud. Nevertheless, such proof may be considered by you in determining whether the defendant engaged in a scheme to defraud and whether he did so with knowledge and an intent to defraud.

(SPA 6-7). After providing the substantive instructions on attorneys' duties (SPA 7-10), Judge Furman forcefully reiterated the limited purpose for they could be used:

Let me stress again: Proof that the defendant violated one or more of his professional duties under California law does not, without more, mean that he is guilty of any crime. That is, a lawyer can violate his ethical duties under California law without having the intent required to commit a crime. The question you must decide with respect to the first two

elements of the Count One is whether the
defendant knowingly, willfully, and with
the intent to defraud, devised or partici-
pated in a scheme or artifice to defraud or
obtain money or property by materially
false and fraudulent pretenses, represen-
tations or promises as alleged in Count
One of the indictment—not whether he
violated his ethical obligations.

(SPA 10).

While the jury deliberated, Avenatti moved for a
mistrial, claiming it was error to instruct the jury that
"'the misappropriation of clients' funds is a particu-
larly serious violation of a lawyer's ethical duty of loy-
alty.'" (Dkt. 363 (quoting Judge Furman's instruc-
tions, SPA 7)). Judge Furman denied the motion:

As Defendant does not dispute, it is an
accurate statement of the law—indeed, it
is a near verbatim quotation from the
California Supreme Court's decision in
*McKnight v. State Bar*, 53 Cal. 3d 1025,
1035 (1991). Contrary to Defendant's
suggestion, it does not "suggest[ ] to the
jury that defendant did in fact misappro-
priate money"; it merely ensures that the
jury understands correctly the principles
of law relevant to its factual determina-
tions. The Court's instructions are clear
that it is the sole province of the jury to
find the facts. *See also* Tr. 1581-82, 1717.
Nor does that one sentence "transform[ ]
this criminal case into a determination of

whether defendant violated his ethical duty of loyalty." The Court's instructions as a whole make abundantly clear that while the jury may consider the relevant ethical rules in making its findings, an ethical violation, without more, does not mean that the defendant committed any crime. *See* Tr. 1741-42, 1745.

(Dkt. 363).

## B. Applicable Law

An appellant challenging a jury instruction faces a heavy burden. He must demonstrate that: (1) he requested a charge that "accurately represented the law in every respect"; and (2) the charge actually delivered, when viewed as a whole, was erroneous and prejudicial. *United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004); *see also United States v. White*, 552 F.3d 240, 246 (2d Cir. 2009) ("To secure reversal on a flawed jury instruction, a defendant must demonstrate both error and ensuing prejudice."). In reviewing jury instructions, this Court does not look only to the particular words or phrases challenged by the defendant, but must "review the instructions as a whole to see if the entire charge delivered a correct interpretation of the law." *United States v. Carr*, 880 F.2d 1550, 1555 (2d Cir. 1989); *see also United States v. Mulder*, 273 F.3d 91, 105 (2d Cir. 2001). An "instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *United States v. Roy*, 783 F.3d 418, 420 (2d Cir. 2015).

Where a defendant has properly preserved an objection to the jury instructions, reversal will not be warranted if the alleged error was harmless. Fed. R. Crim. P. 52(a); *see United States v. Gansman*, 657 F.3d 85, 91-92 (2d Cir. 2011). Thus, a conviction should be affirmed despite instructional error if it "appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Neder v. United States*, 527 U.S. 1, 15 (1999).

## C. Discussion

### 1. The Challenged Instructions Were Correct

Avenatti does not argue on appeal that any part of Judge Furman's instruction on the duties he owed Daniels was legally incorrect. And he agrees that it was proper for the District Court to instruct the jury on this subject. (Br. 38-39). Instead, Avenatti contends that Judge Furman's instruction was irrelevant in certain parts, confusing, and imbalanced. Each claim is without merit.

To start, the instructions were not "too long and overly detailed" (Br. 39), and even if they were, that would not constitute legal error. In the written version of Judge Furman's jury charge, the instructions regarding an attorney's duties constituted less than four pages of a thirty-six-page charge (*see* A. 483-518)— hardly the "pages and pages" claimed by Avenatti (Br. 40). Nor does the case Avenatti cites—the Fifth Circuit's opinion in *United States v. McCracken*, 488 F.2d 406, 414 (5th Cir. 1974) (Br. 40)—help him. In that case, the Fifth Circuit considered a charge where "the instructions [we]re unduly repetitive in some

respects," and concluded that, "[b]oring the instructions might have been," but the defect was purely "literary" and not a cause to undermine the jury's verdict. *McCracken*, 488 F.2d at 414. Here, by contrast, the only portion of the instructions where Judge Furman repeated himself was admonishing the jury that a violation of an ethical duty does not mean that an attorney committed a crime (SPA 6-7, 10)—hardly repetition about which Avenatti can now complain or assert prejudice.

Avenatti has also failed to show that any portion of the instructions was irrelevant. Avenatti asserts that the only reason instructions regarding an attorney's duties were given was "to define, in this wire fraud trial, a lawyer's duty to disclose information and whether non-disclosure can rise to a fraudulent misrepresentation under 18 U.S.C. § 1343." (Br. 37; *see also* Br. 38-39, 40). But his concession that one part of the instruction was relevant does not suffice to show that other parts were irrelevant. In assessing whether Avenatti engaged in a scheme to defraud and intended to do so (or, as Avenatti claimed, operated in good faith), it was relevant for the jury to understand the many ways in which Avenatti's conduct departed from the standards with which he was obligated to comply as an attorney. (*See* Dkt. 210 at 2; A. 447 (Tr. 1515)).

For example, Avenatti criticizes as irrelevant Judge Furman's instructions regarding the prohibition on commingling funds. (Br. 41-42). Judge Furman instructed the jury, in substance, that: (1) when a lawyer receives money on behalf of a client, the lawyer must put that money in a client trust account,

promptly notify the client of the funds, and promptly provide all undisputed funds to the client; (2) when a client asks for information regarding money held by the attorney, the attorney must promptly provide that information; (3) an attorney may not commingle funds belonging to a client with funds belonging to the attorney; and (4) if there is any dispute over who is entitled to the funds, the disputed portion may not be withdrawn from the client trust account. (SPA 9-10). These instructions were relevant to Avenatti's intent, given that Avenatti did not notify Daniels of his receipt of her funds, did not promptly provide undisputed funds to her, did not provide information to Daniels about her money when she requested, and did not maintain funds over which Daniels maintained a claim in the trust account, but rather immediately transferred those funds to law firm operating accounts, where they were commingled with what little money was in the operating accounts. (*See supra* at 8-18). The dissonance between these facts and Avenatti's duties was probative of his intent and lack of good faith. *See United States v. Skelos*, 707 F. App'x 733, 740 (2d Cir. 2017) (evidence of ethics rules violated by defendant's behavior relevant to his intent to defraud).

Avenatti also errs in contending that Judge Furman's instructions were "imbalanced, injected the judge's personal opinion and improper commentary into deliberations, and invaded jurors' province" (Br. 38). In support of this claim, Avenatti relies on a sentence from Judge Furman's instructions stating that " '[t]he misappropriation of client funds is a particularly serious violation of a lawyer's ethical duty of loyalty.' " (Br. 44 (quoting A. 555)). According to

Avenatti, this portion of the charge "was not instruction, but improper commentary" that "conveyed the court's opinion, not a neutral rule." (*Id.*). But the language comes directly from the Supreme Court of California's opinion in *McKnight v. State Bar*, 53 Cal. 3d 1025, 1035 (1991), and, as Avenatti conceded during the charge conference, was a correct statement of the law (A. 463 (Tr. 1579)). Further, the gravity of an attorney misappropriating a client's money was directly relevant to intent—it reflected the seriousness with which attorneys are expected to take the care of client funds, and was therefore relevant to the jury's assessment of Avenatti's *mens rea*. Nor did this statement reflect "commentary" or "opinion" on the facts of this case, because nothing about Judge Furman's statement indicated that Avenatti had misappropriated client funds, a fact that was obviously in dispute between the parties. Judge Furman told that jury that "whether" Avenatti had breached his duties could be relevant to two elements of Count One, not that Avenatti had or appeared to have breached his duties. (SPA 7). A district court similarly may explain to a jury the relevance of uncharged bad acts—also often offered as bearing on a defendant's intent to commit the charged crime—without implying to the jury that the defendant committed the uncharged acts. *See Huddleston v. United States*, 485 U.S. 681, 691 (1988).

Avenatti's reliance on *People v. Stein*, 156 Cal. Rptr. 299 (Cal. Ct. App. 1979), is thus misplaced. In that case, "[t]he instructions given to the jury stated, 'Evidence has been presented *tending* to show that the defendant *may have violated*' the applicable rules, and this may be considered 'only insofar as it *may tend* to

prove that the defendant possessed the specific intent required . . . .'" *Id.* at 239 (emphases in *Stein*). By contrast, Judge Furman's instructions did not comment on what the evidence tended to show, or what inferences should be drawn from the evidence. Judge Furman was well aware of *Stein*, and noted during the charge conference that "in response to Mr. Avenatti's submission and his citation to *People v. Stein*, I decided to underscore" that a violation of an attorney's ethical duties does not mean that he broke the law "by reiterating it at the close of the instruction on professional duties." (A. 447 (Tr. 1515-16)).

Moreover, to the extent *Stein* might be read to suggest that an attorney's professional duties cannot be relevant to a defendant's intent in a case like this (*see* Br. 42), that interpretation would be inconsistent with Avenatti's concession regarding the relevance of this subject. (*See* Br. 37, 38-39). It would also represent a disagreement between an intermediate state appellate court applying state rules in 1979 and the views of several federal appellate courts applying the Federal Rules of Evidence more recently. As those courts have correctly concluded, "proof of a violation of a professional rule may play an evidentiary function in assessing the mens rea of a lawyer charged with criminal conduct in other contexts." *United States v. Acevedo*, 882 F.3d 251, 266 (1st Cir. 2018) (collecting cases); *see also United States v. Kellington*, 217 F.3d 1084, 1098 (9th Cir. 2000) ("It is well settled that in the prosecution of a lawyer for conduct stemming from his or her representation of a client, expert testimony on the lawyer's ethical obligations is relevant to establish the lawyer's intent and state of mind." (citing *United*

*States v. Cavin*, 39 F.3d 1299, 1309 (5th Cir. 1994), and *United States v. Kelly*, 888 F.2d 732, 743 (11th Cir. 1989))).

Despite Avenatti's repeated assertion that the District Court injected personal opinion and commentary, Avenatti makes no other specific claim of Judge Furman doing so. And the case relied upon by Avenatti— *United States v. Tourine*, 428 F.2d 865 (2d Cir. 1970) (Br. 45)—is instructive but not helpful to him. In *Tourine*, this Court considered a claim "that the overall effect of the manner in which the trial judge summed-up the evidence was so favorable to the Government that the defendants were, in effect, denied a jury trial." 428 F.2d at 869. This Court noted that "[t]he trial judge in a federal court may summarize and comment upon the evidence and inferences to be drawn therefrom, in his discretion," and concluded that, although a trial judge may not advocate particular factual findings, the judge did not do so simply by commenting on the evidence, particularly in light of the judge's instruction that the jury is the sole decider of the facts. *Id.* at 869-70. Judge Furman did not comment upon the facts or evidence, he simply gave correct instructions on the duties of attorneys in California that Avenatti does not like. And in any case, Judge Furman admonished the jurors at least twice that they were "the sole and exclusive judges of the facts" and that he would not comment on the facts. (A. 549 (Tr. 1717), 562 (Tr. 1769)).

Avenatti's allegation that Judge Furman's instructions on the duties of attorneys were imbalanced is further belied by the fact that Judge Furman twice—at

the beginning and the end of the instructions in question—warned the jurors that they "should keep in mind that proof that the defendant violated one or more of his professional duties under California law does not, without more, mean that he committed wire fraud," that "a lawyer can violate his ethical duties under California law without having the intent required to commit a crime," and that, "[t]he question [the jurors] must decide with respect to the first two elements of the Count One is whether the defendant knowingly, willfully, and with the intent to defraud, devised or participated in a scheme or artifice to defraud or obtain money or property by materially false and fraudulent pretenses, representations or promises as alleged in Count One of the indictment—not whether he violated his ethical obligations." (SPA 6-7, 10). Avenatti identifies no reason to believe that the jury disregarded those clear and emphatic instructions. *See United States v. Snype*, 441 F.3d 119, 129 (2d Cir. 2006) ("As the Supreme Court has frequently observed, the law recognizes a strong presumption that juries follow limiting instructions." (collecting cases)).

### 2. Any Error Was Harmless

Even if Avenatti had identified some error in Judge Furman's instructions on this point, there would be no basis to think that any error contributed to the jury's verdict. The evidence of Avenatti's guilt was overwhelming. The financial records left no doubt that he had in fact applied Daniels's money to his personal and business expenses, and his own words, captured in electronic messages he sent, showed that he repeatedly lied to her and others to conceal this theft—

including on such plain and unmistakable facts as whether her publisher had in fact paid her. (*See supra* at 5-18). There is no plausible basis to think that the jury concluded that Avenatti intentionally defrauded Daniels only because the instructions were too long, mentioned commingling of funds, or stated that stealing a client's money is a serious breach of legal ethics. Any conceivable error in these instructions was therefore harmless. *See United States v. Dhinsa*, 243 F.3d 635, 650 (2d Cir. 2001) ("The strength of the government's case against the defendant is probably the most critical factor in determining whether an error affected the verdict."); *see, e.g., Neder*, 527 U.S. at 17 (court's failure to instruct on an element of the charged offense deemed harmless in light of the "overwhelming evidence" supporting the jury's verdict).

## POINT II

### The District Court Correctly Instructed the Jury on the Duty to Deliberate

#### A. Relevant Facts

After deliberating for approximately four hours, the jury sent Judge Furman a note reading, "We are unable to come to a consensus on Count 1. What are our next steps?" (A. 586; *see also* A. 565 (Tr. 1779)). In response, Judge Furman instructed the jury as follows:

> As I instructed you yesterday, in order to return a verdict in this case, each juror must agree as to each count. In other words, your verdict must be unanimous.

You should, therefore, consider all the evidence in the case and fully deliberate upon that evidence in a conscientious manner. Remember to follow all of my instructions, including my instruction that, at all times, the government has the burden of proof beyond a reasonable doubt. Also remember your oath, when you were sworn in as jurors, that you should try this case and attempt to enter a true verdict according to the evidence and the law.

Although each juror must decide the case for him or herself, this should be done after an impartial consideration of all the evidence with your fellow jurors. In the course of your deliberations as a juror, you must examine everybody's point of view. You should not hesitate to reexamine your own views and to change your opinion if you are convinced that it is erroneous. There is no reason to believe that if this case were to be tried again that another jury would be any more intelligent, more impartial or more competent to decide than you are. At the same time, no juror should surrender his or her honest conviction as to the weight or the effect of the evidence to his fellow or her fellow jurors or for the purpose of returning a verdict; it is your right to fail to agree if your honest conviction requires it.

> I would like to suggest at this time that you return to the jury room and reflect upon what I've said and resume your deliberations for such time as you, in your judgment, feel to be reasonable.

(A. 565-66 (Tr. 1781-82)).

The following morning, the jury sent a second note to Judge Furman stating:

> We have one juror who is refusing to look at evidence and is acting on a feeling. We need assistance on moving forward. She does not believe she needs to prove her side using evidence and refuses to show us how she has come to her conclusion. *Please* help us move forward. Not going on any evidence, all emotions and does not understand this job of a jury.

(A. 588; *see also* A. 1576 (Tr. 1817)). The Government, observing similarities to the circumstances presented in *United States v. Baker*, 262 F.3d 124 (2d Cir. 2001), proposed that the court take steps analogous to those approved by this Court in *Baker* to ensure that the jurors were complying with their duty to deliberate, including making inquiry of the jurors. (A. 576-77 (Tr. 1817-20)). Judge Furman agreed that the note "implicates squarely the circumstances in *Baker*, *Thomas*,[2] and the like," but determined that "a more deliberate and incremental approach [would be] more

---

2 *United States v. Thomas*, 116 F.3d 606 (2d Cir. 1997).

appropriate." (A. 578 (Tr. 1824)). Accordingly, Judge Furman provided the following additional instruction, again reminding the jury of its duties:

> At the beginning of this case, you each took an oath to well and truly try this issue and a true verdict give according to the law and the evidence.

> Pursuant to that oath, each of you has a duty to deliberate. That entails a duty to consult with one another, to consider each other's views with an open mind, and to discuss the evidence with the objective of reaching a just verdict if you can do so.

> Under your oath as jurors, you are not to be swayed by sympathy or emotion. You should be guided solely by the evidence presented during the trial and the law as I gave it to you, without regard to the consequences of your decision. You have been chosen to try the issues of fact and reach a verdict on the basis of the evidence or lack of evidence. If you let sympathy or emotion interfere with your clear thinking, there is a risk that you will not arrive at a just verdict. You must make a fair and impartial decision so that you will arrive at a just verdict.

> Your verdict must be based on the evidence introduced at trial or the lack of evidence. But I remind you the defendant

has no burden to present any evidence. As I have told you many times, the burden of proof lies solely with the government.

As you deliberate, you should examine the questions put to you with candor and with a proper regard and deference to the opinions of each other. If, after listening to your fellow jurors, and if, after stating your own view, you become convinced that your view is wrong, do not hesitate because of stubbornness or pride to change your view. On the other hand, if you have honest convictions and beliefs based on the evidence presented at trial, you should not surrender those convictions and beliefs solely because of the opinions of your fellow jurors or because you are outnumbered.

I remind you that your verdict must be unanimous. Further, you are reminded that, if at any time you are not in agreement, you are not to reveal the positions of the jurors, including a split of the vote, to anyone, including me, at any time during your deliberations.

With that, I will ask you to return to the jury room to continue your deliberations. I am going to give you copies of the instructions that I just read to you, as well as the instructions I read to you yesterday in response to your first two notes.

You should consider all of these instructions along with all of my other instructions in reaching a verdict in this case. If, at any point in your deliberations, anyone on the jury is refusing to deliberate in accordance with my instructions, you are free to send us another note. And, of course, if you have any additional questions or concerns, you can always send us another note as well.

(A. 580-81 (Tr. 1835-37)).

After receiving this instruction, the jury resumed deliberations for several hours, at which point the jury reached a unanimous verdict convicting the defendant on both counts. (A. 582 (Tr. 1841-43), 593).

## B. Applicable Law

"It is well-settled that jurors have a duty to deliberate. Jurors 'should examine the question submitted with candor, and with a proper regard and deference to the opinions of each other.'" *Baker*, 262 F.3d at 130 (quoting *Allen v. United States*, 164 U.S. 492, 501 (1896)). "It is their duty to decide the case if they can conscientiously do so, and thus they should listen, with a disposition to be convinced, to each other's arguments." *Id.* When a district court finds that a juror "has impermissibly refused to participate in the deliberation process," dismissal of the juror is appropriate. *Id.* (citing *United States v. Barone*, 114 F.3d 1284, 1307 (1st Cir. 1997)).

A district court's decision, following a reported deadlock, to deliver a supplemental instruction

designed to encourage jurors to continue their deliberations is reviewed for abuse of discretion. *See United States v. Crispo*, 306 F.3d 71, 77 (2d Cir. 2002). This Court will find such an abuse of discretion only when a supplemental instruction "tends to coerce undecided jurors into reaching a verdict," that is, when "the charge encourages jurors to abandon, without any principled reason, doubts that any juror conscientiously holds as to a defendant's guilt." *United States v. McDonald*, 759 F.3d 220, 223 (2d Cir. 2014) (quoting *United States v. Vargas-Cordon*, 733 F.3d 366, 377 (2d Cir. 2013)); *see Crispo*, 306 F.3d at 77. To determine whether a supplemental charge is improperly coercive, this Court conducts an "individualized" assessment, *Crispo*, 306 F.3d at 77, evaluating the charge "in its context and under all the circumstances," from the "viewpoint of a juror in the minority position," *McDonald*, 759 F.3d at 223 (quoting *Lowenfield v. Phelps*, 484 U.S. 231, 237 (1988)).

## C. Discussion

Avenatti contends that Judge Furman's instruction on the final day of deliberations directing the jurors to continue deliberating "singled out the holdout juror and was impermissibly coercive." (Br. 48, 49 (capitalization removed)).[3] To the contrary, the instruction singled out no one, reiterated uncontroversial and

---

[3] In what appears to be an error, Points II and Point III of Avenatti's brief are duplicative; Point II contains part of the text also found in Point III, and does not contain any other material. (*See* Br. 48-50).

uncontroverted legal principles, dealt properly with evidence of juror misconduct, and was well within Judge Furman's discretion.

To start, the instruction was a "modified *Allen* charge," and "therefore carries with it a lesser threat of coercing jurors to abandon their conscientious beliefs." *United States v. Calderon*, 944 F.3d 72, 93 (2d Cir. 2019). The traditional *Allen* charge—which this Court has continued to approve, consistent with Supreme Court precedent—urges jurors in the minority to consider whether the majority might be correct, without a reciprocal suggestion to the majority. *See Vargas-Cordon*, 733 F.3d at 377. Judge Furman's instruction, by contrast, urged all jurors to be open to opposing views. (A. 565-66 (Tr. 1781-82)). It thus comports with the modern trend to give inherently less coercive charges. *See Calderon*, 944 F.3d at 93 (discussing the "distinction between 'the original Allen charge,' which conveys 'the suggestion that jurors in the minority should reconsider their position,' and the modern trend toward 'modified' *Allen* charges that do not contrast the majority and minority positions.'" (quoting *Spears v. Greiner*, 459 F.3d 200, 204 n.4 (2d Cir. 2006)).

"[C]ritically, the district court's oral instruction included a caution to jurors that they did not have to relinquish individual beliefs." *United States v. Melhuish*, 6 F.4th 380, 392 (2d Cir. 2021). Immediately before telling the jurors that any verdict had to be unanimous, Judge Furman instructed them "if you have honest convictions and beliefs based on the evidence presented at trial, you should not surrender those

convictions and beliefs solely because of the opinions of your fellow jurors or because you are outnumbered." (A. 581 (Tr. 1836-37)). This Court has repeatedly found that *Allen* and modified *Allen* charges were not coercive where they contained such precautionary language. *See, e.g.*, *McDonald*, 759 F.3d at 224-25; *Vargas-Cordon*, 733 F.3d at 378 (affirming traditional *Allen* charge accompanied by this language, "an instruction we have previously held to mitigate greatly a charge's potential coercive effect"); *United States v. Ruggiero*, 928 F.2d 1289, 1299 (2d Cir. 1991) (finding that a repeated *Allen* charge is not "inevitably" coercive and noting that both instructions included cautionary language counseling jurors not to surrender conscientiously held views). By contrast, many of the cases on which Avenatti relies flagged the absence of this caution as an important factor in showing coercion. *Crispo,* 306 F.3d at 77; *United States v. Haynes*, 729 F.3d 178, 194 (2d Cir. 2013); *Smalls v. Batista*, 191 F.3d 272, 278 (2d Cir. 1999).[4]

Avenatti acknowledges that Judge Furman gave such a warning here—twice—but claims that it was undone by Judge Furman's "repeated insistence that the jury 'make a fair and just impartial decision' and 'arrive at a just verdict.'" (Br. 55-56). There is nothing

---

[4] This language is not, however, mandatory. *See Vargas-Cordon*, 733 F.3d at 377 ("[A]lthough we have stressed the importance of reminding jurors in an *Allen* charge not to abandon their conscientiously held views, we have also upheld instructions that lacked such a warning.").

wrong with the first quotation—of course every juror's decision should be just and impartial. And the second quotation is egregiously stripped from context. In fact, Judge Furman told the jurors, "You must make a fair and impartial decision so that you will arrive at a just verdict." (A. 580 (Tr. 1835-36)). That is, he was not telling the jurors that they must reach a verdict, but that their verdict must be just. This is especially clear because two paragraphs earlier Judge Furman had told the jurors "to discuss the evidence with the objective of reaching a just verdict *if you can do so*." (A. 580 (Tr. 1835) (emphasis added); *see also* A. 566 (Tr. 1782) (instructing jurors earlier that "it is your right to fail to agree if your honest conviction requires it")). Thus, far from resembling the cases in which judges improperly ordered the jurors to reach a verdict, Judge Furman used the sort of milder language this Court has approved. *See Spear*s, 459 F.3d at 206 (finding that even instruction which lacked other important precautions was not coercive where it urged jurors "to continue deliberations with a view toward arriving at a verdict *if that's possible*.").

In addition, the jury continued deliberating for several hours after receiving the contested instruction, "which suggests that the charge was not so coercive as to end all reasoned discussion." *Crispo*, 306 F.3d at 77. Specifically, the jury reported to receive the instruction at 11:55 a.m., and did not return a verdict until 2:33 p.m. (A. 580 (Tr. 1835); 581 (Tr. 1842)). That the jury deliberated over lunch, as in *Crispo*, 306 F.3d at 77, further confirms that it did not perceive Judge Furman's instruction as a directive to reach a verdict. *See also Vargas-Cordon*, 733 F.3d at 378 (that "jury

deliberated for some four hours after receiving this instruction . . . strongly indicates a lack of coercion").

Avenatti also ignores the circumstances that led to the instruction and the discretion afforded to Judge Furman in addressing allegations of juror misconduct. Contrary to the District Court's findings, Avenatti simply asserts that a juror was holding out due to her views of the evidence, entirely ignoring the uncontroverted record that the juror was refusing to deliberate. (*Compare* Br. 49-54 *with* A. 576-78 (Tr. 1817-24)). Thus, when Judge Furman instructed the jurors to deliberate, and to send another note if any of their number refused to do so, there was nothing improperly "coercive" about his instruction: A court may not coerce a jury to reach a verdict, but it absolutely can—and should—order jurors to participate in deliberations. Indeed, this Court has approved the far more drastic measure of simply removing a juror who refuses to deliberate. *See Baker*, 262 F.3d at 130.

Avenatti cites an unpublished 2001 opinion for the proposition that special care must be taken when there is a lone holdout juror whose position is known to the judge. (Br. 51 (citing *United States v. Pirro*, 9 F. App'x. 45, 49 (2d Cir. 2001))). But, for all the reasons just discussed, Judge Furman's instruction was appropriately cautious. Indeed, the case on which Avenatti relies affirmed the use of a modified *Allen* charge accompanied by similar precautions. *See Pirro*, 9 F. App'x at 49. This Court has repeatedly reached the same result elsewhere. *See Crispo*, 306 F.3d at 76-77 (affirming modified *Allen* charge where there was a "lone dissenter" whose identify was known to the district

court); *United States v. Robinson*, 560 F.2d 507, 517
(2d Cir. 1977) (en banc) ("The fact that the judge knew
that there was a lone dissenter does not make the
charge coercive inasmuch as the nature of the dead-
lock was disclosed to the Court voluntarily and with-
out solicitation."); *United States v. Jennings*, 471 F.2d
1310, 1313-14 (2d Cir. 1973) (affirming "*Allen*-type"
charge where jury advised that it stood 11 to one for
conviction); *United States v. Martinez*, 446 F.2d 118,
119-20 (2d Cir. 1971) (same); *United States v. Baldeo*,
615 F. App'x 26, 27 (2d Cir. 2015).

Similarly, there was nothing improper about the
need to charge the jury twice. This Court has ex-
plained that it "does not regard a repeated *Allen*
charge as inevitably coercive." *Ruggiero*, 928 F.2d at
1299; *United States v. Roman*, 870 F.2d 65, 77 (2d Cir.
1989) (noting that "even a second charge imploring a
decision would not be per se error"); *United States v.
O'Connor*, 580 F.2d 38, 44 (2d Cir. 1978) ("we find no
merit to the objection to the giving of two modified Al-
len charges"); *United States v. Robinson*, 560 F.2d 507,
517 (2d Cir. 1977) (finding no abuse of discretion in
district court's decision to give a second Allen-type
charge).

Nor does the supposedly "bitter and acrimonious"
tone of the jury's note (Br. 53) lend anything to
Avenatti's argument. When a juror refuses to deliber-
ate, a note reporting that dereliction of duty may be
expected to contain strong words. *See, e.g.*, *Baker*, 262
F.3d at 128 (jury note requested that juror be removed,
stating, among other things, "She won't even look at
any of the evidence."). The question for this Court is

not how the jurors expressed themselves, but whether Judge Furman abused his discretion in responding to their note. It is difficult to contend that Judge Furman abused his discretion while foregoing more severe measures this Court has also condoned and instead giving the usual modified *Allen* charge, accompanied by the precautionary language this Court has repeatedly encouraged. *Cf.*, *id.* (affirming removal of holdout juror who refused to deliberate); *Vargas-Cordon*, 733 F.3d at 377-78 (affirming instruction including "the request that minority jurors—but not majority jurors—reconsider their views").

Finally, Judge Furman did not err by specifically discussing sympathy in the contested instruction. Avenatti concedes that Judge Furman "had to address, in some fashion," the jury note's statements that a juror was refusing to deliberate out of sympathy and emotion, but maintains that reading the original instructions on this point would have been preferable. (Br. 56). That falls far short of identifying an abuse of discretion. And contrary to Avenatti's claim, discussing sympathy at the same time that it urged the jury to deliberate did not mean that the instruction unfairly singled out the dissenting juror. After all, the Supreme Court has affirmed the "continuing validity" of the traditional *Allen* charge, which does expressly urge jurors in the minority to reconsider their views. *Lowenfield*, 484 U.S. at 237. That reasoning applies "with even greater force, in a case such as this, where the charge given, in contrast to the so-called 'traditional *Allen* charge,' does not speak *specifically* to the minority jurors." *Id.* at 238 (emphasis added). Because Judge Furman did not speak "specifically" to the

holdout juror, Avenatti's attempt to construct an infer-
ential "singling out" (Br. 54) is without merit. For ex-
ample, one of the cases on which Avenatti relies exam-
ined a similar argument that a judge's instruction di-
rectly addressing the purported concern with the lone
holdout—in that case, refusal to follow the law—but
not the holdout herself, "was tantamount to a direction
to 'follow the eleven other jurors.'" *Pirro*, 9 F. App'x at
48-49.  This Court found "no merit in this argument."
*Id.* at 49. So too here.

## POINT III

### The District Court Correctly Calculated the Loss Amount

At sentencing, the District Court concluded that
the applicable loss amount under the United States
Sentencing Guidelines (the "Guidelines" or "U.S.S.G.")
was $297,500—the amount of both payments misap-
propriated by Avenatti. (A. 628). Avenatti contends
here, as he did below, that he should receive credit un-
der the Guidelines for funds he used to replace the sto-
len money in order to conceal his theft, and for work
that he performed for Daniels. (Br. 58-68). Neither ar-
gument has legal or factual merit.

### A.  Relevant Facts

On June 2, 2022, Judge Furman sentenced
Avenatti to a term of imprisonment of 24 months on
Count One and 24 months on Count Two, to be served
consecutively, with 18 months of the sentence on
Count One to be served concurrently with the sentence
imposed for Avenatti's separate convictions in *United*

*States v. Avenatti*, 19 Cr. 373 (PGG). (A. 639, 643). Avenatti was thus effectively sentenced to six additional months' imprisonment as a result of his conviction on Count One. (A. 639). And even disregarding the largely concurrent nature of the sentence on Count One, the sentence on that count and the sentence as a whole were well below the Guidelines calculated by the United States Probation Office and the District Court. (*See* A. 628-30).

Prior to sentencing, Avenatti argued that the loss amount under Section 2B1.1(b)(1) of the Guidelines should be $148,750, rather than $297,500, because Avenatti returned the stolen second book payment to Daniels, or should be zero because Avenatti should receive credit for legal services he provided for which, in his view, he was not compensated. (A. 604-05). During the sentencing proceeding, Judge Furman rejected both arguments. First, Judge Furman noted that it was unclear whether Avenatti could be considered to have *returned* any money, because rather than returning the funds he had taken, Avenatti obtained new funds through a loan from which he provided payment to Daniels. (A. 628). Judge Furman did not, however, resolve that question, because "the evidence at trial was overwhelming, that Mr. Avenatti paid Ms. Daniels . . . to forestall her imminent discovery of his crime," and that therefore Avenatti was not entitled to credit for this payment. (A. 628). Judge Furman also concluded that there was no law to support Avenatti's view that he should generally receive credit for work he performed for Daniels, and that, regardless, "Mr. Avenatti got what he bargained for, and then some"

because Avenatti had "received substantial remuneration through his representation" of Daniels. (A. 628).

## B. Applicable Law

Appellate review of a district court's sentence "encompasses two components: procedural review and substantive review." *United States v. Cavera*, 550 F.3d 180, 187 (2d Cir. 2008) (en banc). A district court commits procedural error if it fails to calculate the Guidelines range, makes a mistake in its Guidelines calculation, treats the Guidelines as mandatory, does not consider the 18 U.S.C. § 3553(a) factors, or rests its sentence on a clearly erroneous finding of fact. *Gall v. United States*, 552 U.S. 38, 41 (2007).

Under the clear error standard, a district court's factual findings will not be disturbed so long as they are "plausible in light of the record viewed in its entirety." *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985). "Where there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous." *Hernandez v. New York*, 500 U.S. 352, 369 (1991). The calculation of loss need only be determined by a preponderance of the evidence. *See United States v. Watts*, 519 U.S. 148, 156 (1997); *United States v. Gonzalez*, 407 F.3d 118, 125 (2d Cir. 2005) (holding that a district court's authority "to resolve disputed facts by a preponderance of the evidence when arriving at a Guidelines sentence" "endures post-*Booker*").

Application Note 3(E) of Section 2B1.1 of the Sentencing Guidelines provides that, when calculating loss, the sentencing judge should reduce the loss

amount by the amount of "money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected." U.S.S.G. § 2B1.1, cmt. n.3(E)(i). "The time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency." *Id.*

## C. Discussion

### 1. The Credit Against Loss Rule Does Not Apply

Avenatti first claims that he should have received a credit against loss in the amount of $148,750, which he paid Daniels after he stole the second advance payment and before he stole the third. As an initial matter, Avenatti did not "return" the stolen money at all; he sought out new funds to place in Daniels's account after expending the stolen funds, and therefore he is not entitled to a credit. *See* U.S.S.G. § 2B1.1 cmt. 3(E)(i) (credit against loss only permitted for "[t]he money *returned*" (emphasis supplied)); *United States v. Fumo*, 655 F.3d 288, 312-13 (3d Cir. 2011) ("The use of the word 'returned' signifies that for a credit to apply, the defendant must have either *returned* the very same money or property, or have provided services that were applied to the very same money, value, or property that was lost or taken during the fraud." (emphasis in original)).

In any case, Judge Furman's finding that "the evidence at trial was overwhelming, that Mr. Avenatti paid Ms. Daniels the equivalent of the third book payment to forestall her imminent discovery of his crime" (A. 628) was correct, and thus far from clearly erroneous. As further detailed above (*supra* at 10-13), after Avenatti had stolen the second advance payment, Daniels wrote Avenatti that the publishers "still have not paid me despite final version being submitted a while ago," and threatened to go directly to the publisher herself. (A. 679, 1146; *see also* A. 297 (Tr. 922-23)). Just days later, Avenatti told his friend Macias that Daniels was "going crazy" because the publisher for her book had not paid, even though the publisher had in fact paid the money to Janklow, who had wired it directly into an account controlled by Avenatti. (A. 248-49 (Tr. 728-29, 732-33)). Shortly thereafter, Avenatti obtained a loan through Macias, which he used to pay Daniels and make it appear that the money had come from the publisher. (A. 172-73 (Tr. 428-29), 253-54 (Tr. 746-50), 299 (Tr. 928-99), 859-60, 1086, 1091, 1124, 1147). Judge Furman was certainly entitled to find, by a preponderance of the evidence, that Avenatti paid Daniels only after "the time the defendant knew or reasonably should have known that the offense was . . . about to be detected by a victim." U.S.S.G. § 2B1.1 cmt. n.3(E)(i)(II).

Avenatti contends that "[t]he record was . . . entirely bereft of evidence that [Daniels] had detected, or was about to detect, that Avenatti had received but not yet passed on to her the second payment," when he gave her the $148,750 check. (Br. 62). This claim is inaccurate as a matter of fact—Daniels had clearly

noticed the missing money and was planning to take a step (contacting the publisher) that would have revealed the theft, and ceased investigating only after Avenatti replaced the funds. But it also irrelevant as a matter of law, because the question presented to Judge Furman was not whether Daniels was in fact about to detect the crime, but whether "the defendant knew or reasonably should have known that the offense was detected or about to be detected." U.S.S.G. § 2B1.1 cmt. n.3(E)(i)(II). That Daniels told Avenatti that she was going to contact the publisher directly about the missing funds and that Avenatti then frantically looked for a loan to repay her demonstrate that Avenatti knew and reasonably should have known that the offense was about to be detected.

Avenatti also argues that in calculating the loss amount, he should receive credit for various services he rendered to Daniels when representing her. (Br. 63-66). In other words, Avenatti claims that he should not be held accountable for loss he caused to the victim of his fraud because he believes the services he provided her as an attorney exceeded the amounts that she paid him. The record does not support the view that Avenatti provided services to Daniels for which he was not compensated. As Judge Furman found, "Mr. Avenatti got what he bargained for, and then some." (A. 628). The evidence at trial established that Avenatti agreed to represent Daniels in return for a $100 retainer, remuneration from a crowd-funding site to be established, and the possibility of a contingency fee in the event of successful litigation. (A. 289

(Tr. 890-91), 661).[5] Thus, Avenatti was separately provided the "fair market value of . . . the services rendered," U.S.S.G. § 2B1.1, cmt. n.3(E)(i), because he received exactly the fee he negotiated on the open market. Put another way, Avenatti provided some services to Daniels, received the agreed-upon compensation, and then separately defrauded her of $297,500 to which he never had any claim. But for the credit against loss rule to apply, "the defendant must have . . . provided services that were applied to the very same money, value, or property that was lost or taken during the fraud." *Fumo*, 655 F.3d at 313 (citing *United States v. Radtke*, 415 F.3d 826, 842 (8th Cir. 2005) (rejecting "credit for *other* benefits provided to employee-victims that do not correlate directly with the amounts withheld from the third-party administrator as part of the fraud")).

Avenatti fails to identify any contrary authority. Several of the cases he cites affirmed denial of a credit against loss. *See United States v. Rowland*, 826 F.3d 100, 116 (2d Cir. 2016); *United States v. Byors*, 586 F.3d 222, 226 (2d Cir. 2009); *United States v. Blitz*, 151 F.3d 1002, 1012 (9th Cir. 1998). That the flaws in those defendants' arguments differed from the flaws in

---

[5] The contract also provided that if Avenatti assisted Daniels in obtaining a book deal, Avenatti would receive a fee in an amount to be negotiated later. (A. 661). Avenatti later forswore that fee (A. 295 (Tr. 913-14)), even while obtaining 2.5% of Daniels' advance by requesting it from her agent (A. 96 (Tr. 122-23)).

Avenatti's argument (*See* Br. 63-66) does not make his argument any more meritorious.

Avenetti also finds no support in *United States v. Barnes*, 125 F.3d 1287, 1291 (9th Cir. 1997). (*See* Br. 66). That case found the credit applicable, but only under circumstances that illustrate why Avenatti should not receive it. In *Barnes*, a pharmacist impersonating a physician inspected blood plasma despite lacking a license to do so, yet apparently provided "satisfactory, albeit illegitimate service." 125 F.3d at 1289, 1291. Because the district court based the loss amount was on the total revenues the defendant's employer charged for the blood plasma, but the defendant's unlicensed examination of the plasma did not cause loss to anyone associated with the employer, the Ninth Circuit explained that the defendant should receive credit for his satisfactory work. *Id.* at 1291. That is, the defendant's loss amount should have reflected the true loss. But no one questioned that the loss amount was at least the salary the defendant obtained from his employer by falsely claiming that he was a doctor. *Id.* at 1292. In other words, the defendant in *Barnes* did not even attempt to argue, as Avenatti now does, that he was allowed to steal from his employer because he was underpaid. *See also Fumo*, 665 F.3d at 313 (explaining that defendant's theory "would allow, for instance, an officer of a corporation which embezzled from his employer to claim credits against the loss caused by the

embezzlement for overall increases in the company's assets under his watch.").[6]

## 2. Any Error Was Harmless

If Judge Furman had erred in calculating the loss amount, that error would be harmless, because it did not affect the ultimate sentence. Avenatti claims that any Guidelines error cannot be harmless (Br. 67), but the incorrect application of a Guidelines enhancement can be harmless where "the record indicates clearly that the district court would have imposed the same sentence in any event." *United States v. Jass*, 569 F.3d 47, 68 (2d Cir. 2009). Here, Judge Furman imposed a non-Guidelines sentence on Count One, and expressly

--------

[6] Avenatti also relies on *United States v. Klein*, 543 F.3d 206, 214-15 (5th Cir. 2008). (Br. 66). *Klein* is similar to *Barnes*. There, a doctor fraudulently over-billed an insurance company for certain drugs, but still provided drugs that his patients needed and for which the insurance company would have paid absent any fraud. 543 F.3d at 208-09. The loss amount thus should not have been the total amount the defendant obtained from the insurance company in false submissions, but that amount minus the value of the drugs for which the insurance company would have paid in any event. *Id.* at 209, 214-15. Again, the credit against loss was directly related to the fraud causing the loss —in effect, the loss itself had been misvalued by not deducting the true value of the drugs, because the insurance company was not defrauded of every dollar the doctor received.

did so because he discounted the loss amount enhancement. (A. 638). Judge Furman disagreed with the loss amount Guideline in general, stating that "Section 2B1.2 of the guidelines gives undue weight [to] the loss amount." (A. 638). He also found specific fault with its application to Avenatti's case (A. 638), because he believed that Avenatti's "plan was not so much to steal the money outright as it was to deprive [Daniels] temporarily of her funds." (A. 639). That is, Judge Furman essentially accepted Avenatti's theory that he had repaid and intended to repay Daniels, and thus that the loss amount inaccurately reflected the gravity of his crimes. Judge Furman simply gave force to that argument under 18 U.S.C. § 3553(a) rather than the Guidelines, by effectively extending Avenatti's time in prison for only six months based on his conviction on Count One. (*See* A. 638-39). Because Judge Furman's loss amount calculations clearly did not affect the sentence he imposed, any error in calculating loss amount was harmless.

## POINT IV

### Avenatti's Challenge to the Sequence in which Restitution Will Be Paid Is Meritless and Waived

### A.  Relevant Facts

At Avenatti's sentencing, Judge Furman directed that Avenatti pay restitution to Daniels in the amount of $148,750 and forfeit to the Government $297,500. (A. 640, 647, 649). To avoid Avenatti having simultaneous restitution obligations that would double his monthly cost, Judge Furman granted Avenatti's

request that his restitution obligation in this case commence after he had fulfilled his restitution obligation from his prior conviction. (A. 640, 648).

On September 22, 2022, the Government filed a proposed restitution order providing additional clarity on Avenatti's restitution obligation. (Dkt. 450). In addition, the proposed order reversed the order in which Avenatti would pay restitution such that he would pay Daniels first, then the victim in his prior case, which was the corporation Nike, Inc. (Dkt. 450; A. 652). Thus, the proposed order addressed Avenatti's desire to avoid a double restitution obligation, but switched (with Nike's consent) the order in which payments would be made so that Daniels, a private person, could receive restitution before Nike, a large corporation. (A. 652).

Prior to requesting the order, the Government conferred with Avenatti's counsel, who stated that he had no objection. (Dkt. 450). Judge Furman issued the restitution order on September 23, 2022. (A. 651-54).

## B. Discussion

Avenatti argues that this Court should vacate the restitution order because it directs restitution payments to be remitted to Daniels before Nike, the victim of the extortion scheme for which Avenatti was separately convicted. (Br. 68-71). Avenatti contends that the different sequence of payments that Judge Furman stated orally at sentencing was part of his sentence, and therefore could not be modified. This Court rejected that argument in *United States v. Kyles*, 601 F.3d 78 (2d Cir. 2010). *Kyles* explained that a

56

modification to the schedule of restitution payments that does not change the amount of restitution owed does not alter the sentence. 601 F.3d at 82-84; *see also United States v. Lochard*, 555 F. App'x 94, 96 (2d Cir. 2014) (describing *Kyles* as "holding that as long as amount of restitution remains same, alteration in terms of repayment does not alter [the] sentence").[7] Avenatti is simply wrong that Judge Furman was not permitted to modify the schedule of payment.

Avenatti has also waived any claim of error in the restitution order. Where a defendant has "made a considered decision *not* to object," he has waived even plain error review on appeal. *United States v. Bodnar*, 37 F.4th 833, 844 (2d Cir.), *cert. denied sub nom. Capelli v. United States*, 143 S. Ct. 389 (2022). Because the Government consulted with Avenatti prior to proposing the restitution order, and he affirmatively stated he did not object to it (Dkt. 450), he has waived any subsequent challenge to it. And to the extent Avenatti has merely forfeited rather than waived his challenge, he cannot satisfy the plain error standard of review because, among other reasons, Avenatti has

---

[7]    *United States v. Fareri*, 712 F.3d 593 (D.C. Cir. 2013), upon which Avenatti relies (Br. 69), is not to the contrary. There, the schedule of payments imposed by the district court "exceeded the $3,646,747.83 total announced in the District Court's oral sentence and listed in its written judgment." 712 F.3d at 595. Here, by contrast, the schedule of payments did not change the total restitution and so there was "no change in *sentence.*" *Kyles*, 601 F.3d at 83.

identified no possible harm to him from paying Daniels before Nike. He has thus shown no effect on his substantial rights. *See United States v. Olano*, 507 U.S. 725, 735 (1993) (defendant typically "must make a specific showing of prejudice" in order to show an effect on his substantial rights).

**CONCLUSION**

**The judgment of conviction and restitution order should be affirmed.**

Dated:     New York, New York
           March 17, 2023

                    Respectfully submitted,

                    DAMIAN WILLIAMS,
                    *United States Attorney for the*
                    *Southern District of New York,*
                    *Attorney for the United States*
                    *       of America.*

MATTHEW PODOLSKY,
ROBERT SOBELMAN,
ANDREW ROHRBACH,
HAGAN SCOTTEN,
     *Assistant United States Attorneys,*
                *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 13,981 words in this brief.

DAMIAN WILLIAMS,
*United States Attorney for the*
*Southern District of New York*

By: HAGAN SCOTTEN,
*Assistant United States Attorney*