# 22-1242(L)

To be argued by:
**KENDRA L. HUTCHINSON**

United States Court of Appeals
For the Second Circuit

Docket Nos. 22-1242(L), 22-2550(CON)

UNITED STATES OF AMERICA,

*Appellee,*

-against-

MICHAEL AVENATTI,

*Defendant-Appellant.*

APPEAL FROM A JUDGMENT OF
THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**REPLY BRIEF FOR DEFENDANT-APPELLANT
MICHAEL AVENATTI**

Federal Defenders of New York, Inc.
Appeals Bureau
52 Duane Street, 10th Floor
New York, New York 10007
Tel. No.: (212) 417-8731

*Attorney for Defendant-Appellant*
**MICHAEL AVENATTI**

**KENDRA L. HUTCHINSON**,
*Of Counsel*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................. iii

INTRODUCTION ................................................................................ 1

ARGUMENT ......................................................................................... 2

I.  The Court Erred in Delivering a Lengthy and Prejudicial Final Charge on the Professional Duties of Lawyers That Was Largely Irrelevant, Risked Serious Juror Confusion, Turned the Criminal Trial Into an Attorney Grievance Proceeding, and Improperly Injected the Court's Own Beliefs and Commentary Into Deliberations. ............................ 2

    A.  Whether Avenatti Violated the Professional Duties of a Lawyer Had No Bearing on Whether He Specifically Intended to Defraud Clifford. ...................................... 4

    B.  Charging The Jury That The "Misappropriation Of Client Funds Is A Particularly Serious Violation Of A Lawyer's Ethical Duty Of Loyalty" Was Improper Commentary, Not Based On The Law, and Highly Prejudicial ............................................................. 11

    C.  The Government Attempts to Minimize the Faulty Charge and Characterize It As Harmless, But Fails ........... 15

II.  The Court's Supplemental Instruction In Response to the Jury's Second Declaration of Deadlock, Which Singled Out the Holdout Juror and Insisted That a Verdict Be Returned, Was Impermissibly Coercive. ........................................ 18

    A.  The Record Does Not Show That The Juror Refused To Deliberate. ............................................................ 19

    B.  The Government Fails To Evaluate The Overall Effect Of The Coercive Charge, Given The Context And Circumstances. ................................................. 24

III.  Appellant Withdraws the Sentencing Argument Concerning Loss Amount. ................................................................ 28

IV.  The Restitution Order Must Be Corrected to Conform to the Court's Oral Sentence and Written Judgment. ........................... 29

**CONCLUSION**........................................................................ **31**

**CERTIFICATE OF SERVICE**................................................ **32**

**CERTIFICATE OF COMPLIANCE** ..................................... **33**

# TABLE OF AUTHORITIES

## Cases

*Huddleston v. United States*, 485 U.S. 681 (1988)..................................14

*Johnson v. Zerbst*, 304 U.S. 458 (1938)..................................32

*McKnight v. State Bar*, 53 Cal. 3d 1025 (1991) .....................................15

*Smalls v. Batista*, 191 F.3d 272 (2d Cir. 1999).....................................28

*United States v. Acevedo*, 882 F.3d 251 (1st Cir. 2018)...................10, 11

*United States v. Assi*, 748 F.2d 62 (2d Cir. 1984) ..................................16

*United States v. Baker*, 262 F.3d 124 (2d Cir. 2001) ..............................24

*United States v. Baldeo*, 615 F. App'x 26 (2d Cir. 2015) ........................30

*United States v. Cavin*, 39 F.3d 1299 (5th Cir. 1994)......................10, 11

*United States v. Christo*, 614 F.2d 486 (5th Cir. 1980) ...........................5

*United States v. Crispo*, 306 F.3d 71 (2d Cir. 2002) ..................27, 28, 31

*United States v. D'Amato*, 39 F.3d 1249 (2d Cir. 1994) ..........................4

*United States v. DiNome*, 86 F.3d 277 (2d Cir. 1996)..............................4

*United States v. Forrest*, 571 F. App'x 48 (2d Cir. 2014)........................33

*United States v. Greenberg*, 835 F.3d 295 (2d Cir. 2016) ........................4

*United States v. Jean-Baptiste*, 166 F.3d 102 (2d Cir. 1999) .................20

*United States v. Kellington*, 217 F.3d 1084 (9th Cir. 2000) .............10, 11

*United States v. Kelly,* 888 F.2d 732 (11th Cir. 1989) ............................ 11

*United States v. Kopstein,* 759 F.3d 168 (2d Cir. 2014).......................... 19

*United States v. Kyle*, 257 F.2d 559 (2d Cir.1958)..................................... 5

*United States v. Kyles*, 601 F.3d 78 (2d Cir. 2010) ................................. 34

*United States v. Litwin*, 972 F.3d 1155 (9th Cir. 2020)..................... 25, 26

*United States v. McDonald,* 759 F.3d 220 (2d Cir. 2014)....................... 28

*United States v. Novak*, 443 F.3d 150 (2d Cir. 2006) ............................... 4

*United States v. Olano*, 507 U.S. 725 (1993)........................................... 32

*United States v. Persico*, 349 F.2d 6 (2d Cir. 1965) ................................ 16

*United States v. Quiroz*, 13 F.3d 505, 513 (2d Cir. 1993), *reh'g granted*

  *in part on other grounds, denied in part*, 22 F.3d 489 (2d Cir.1994).. 20

*United States v. Regan*, 937 F.2d 823 (2d Cir. 1991)................................ 5

*United States v. Skelos*, 707 F. App'x 733 (2d Cir. 2017) .............. 8, 9, 10

*United States v. Thomas*, 299 F.3d 150 (2d Cir. 2002)........................... 34

*United States v. Vargas-Cordon*, 733 F.3d 366 (2d Cir. 2013)......... 29, 30

*United States v. Walker*, 191 F.3d 326 (2d Cir. 1999) ......................... 4, 6

*United States v. Wilkerson*, 361 F.3d 717 (2d Cir. 2004)....................... 12

*United States v. Yu-Leung*, 51 F.3d 1116 (2d Cir. 1995)................. 32, 33

**Statutes**

18 U.S.C. § 1343 ...................................................................... 7

**Other Authorities**

California Rule of Professional Conduct 1.4 ........................................... 11

Merriam-Webster Dictionary, available at https://www.merriam-

    webster.com/dictionary/ ....................................................... 12

*United States v. Kopstein,* 759 F.3d 168 (2d Cir. 2014).......................... 17

# INTRODUCTION

This case was much closer than the government cares to admit. Michael Avenatti proffered a good-faith defense that was based on the prosecution's own evidence, which the government was required to disprove beyond a reasonable doubt. And the jury deliberated over the course of three days, requested the entirety of Clifford's testimony, asked for further instruction on "good faith," and reported deadlock or impasse twice. Only at the end of the third day did it finally convict.

Against this backdrop, Avenatti points to two independent errors. First, in the midst of the wire fraud instruction, the court delivered an almost wholly irrelevant, prejudicial, and lengthy charge regarding the professional duties of lawyers. Second, in response to the final jury note reporting a holdout juror, the court administered a supplemental charge that impermissibly coerced a verdict.

For a multitude of reasons, the government's response is not persuasive. It is wrong on the merits as to both issues, and it ignores the harmful impact of the district court's errors given their prejudicial effect and the closeness of the case. Accordingly, this Court should vacate the judgment of conviction and remand for a new trial.

# ARGUMENT

## I. The Court Erred in Delivering a Lengthy and Prejudicial Final Charge on the Professional Duties of Lawyers That Was Largely Irrelevant, Risked Serious Juror Confusion, Turned the Criminal Trial Into an Attorney Grievance Proceeding, and Improperly Injected the Court's Own Beliefs and Commentary Into Deliberations.

The district court here delivered a lengthy final charge on the ethical duties of a California lawyer. As Avenatti argues in the opening brief, this charge was largely irrelevant, confused the issues by turning the federal criminal trial into an attorney grievance proceeding, and served as improper commentary inasmuch as the court told the jury that "misappropriation of client funds is a particularly serious violation of a lawyer's ethical duty of loyalty." Given the facts of this case – turning on Avenatti's representation of Clifford – the court's error in delivering this charge, over specific objection, was highly prejudicial and requires vacatur and remand. App. Br. at 37-47.[1]

_____

[1] Appellant's opening brief is cited "App. Br." The government's responding brief is cited "Gov. Br." Appendix volumes are cited "1A," "2A," etc., while the Special Appendix is "SPA." Entries on the district court docket, *United States v. Avenatti*, 19-cr-374 (S.D.N.Y.), are cited "DE."

The government mainly responds by arguing that a lawyer's ethical duties are relevant to his intent. But wire fraud is a specific-intent crime, and the government was required to prove that Avenatti had the "intent to defraud" Clifford. The government fails to explain why any attorney misconduct he allegedly committed was probative of this intent, or disproved his good-faith defense. The government also argues that the district court did not offer improper commentary when it said that "misappropriation of client funds is a particularly serious violation." But it is incorrect; the statement clearly evinced a qualitative judgment and was not based on any case or law applicable to federal criminal trials. Finally, the government minimizes the import and prejudicial impact of the charge. In doing so, however, it ignores that it had the obligation to disprove Avenatti's good-faith defense beyond a reasonable doubt, and that the jury found this to be a close case.

**A. Whether Avenatti Violated the Professional Duties of a Lawyer Had No Bearing on Whether He Specifically Intended to Defraud Clifford.**

In the government's view, the district court correctly instructed the jury on scores of California ethical rules because deciding whether Avenatti complied with them would help jurors evaluate his *mens rea*. Gov. Br. at 26-30. The government is wrong.

Whether or not Avenatti followed the professional rules was irrelevant to his *mens rea*. Wire fraud is a specific-intent crime. A defendant must act with "the specific intent to harm or defraud the victims of the scheme." *United States v. Walker*, 191 F.3d 326, 334 (2d Cir. 1999). Put another way, the defendant must have a "fraudulent intent" that includes "an intent to harm a party to the transaction." *United States v. Greenberg*, 835 F.3d 295, 305–06 (2d Cir. 2016); *United States v. Novak*, 443 F.3d 150, 159 (2d Cir. 2006). *See also United States v. DiNome*, 86 F.3d 277, 283 (2d Cir. 1996) ("fraudulent intent is '[e]ssential to a scheme to defraud'" (quoting *United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994))); *United States v. Regan*, 937 F.2d 823, 827 (2d Cir. 1991) (mail and wire fraud are "specific intent crimes"

requiring proof of defendant's "'conscious knowing intent to defraud'" (quoting *United States v. Kyle*, 257 F.2d 559, 564 (2d Cir.1958))).

But none of the California ethical rules submitted to the jury required any intent finding whatsoever. Accordingly, the charge allowed the jury to bootstrap a strict liability ethical violation, with its lower burden of proof, into a specific-intent criminal conviction, requiring proof beyond a reasonable doubt. *Cf. United States v. Christo*, 614 F.2d 486, 492 (5th Cir. 1980) (vacating conviction due to government's "attempt to bootstrap" civil banking violations into convictions).

To use an example discussed in the parties' briefs, *see* App. Br. at 41; Gov. Br. at 26-27, the court instructed that, "[l]awyers may not deposit or otherwise commingle funds belonging to the lawyer or their law firm in the client trust account." SPA.9-10. No particular intent is required under the court's instruction; consequently, a person who commits this conduct with any *mens rea*, or none at all, will violate the rule's prohibition. The jury therefore was permitted to find this rule broken *even if* it believed commingling was done without the intent to defraud Clifford, *i.e.,* because Avenatti acted in good faith. Thus, a jury finding that Avenatti had broken this rule would have no bearing on

whether he acted with "the specific intent to harm or defraud" Clifford. *Walker*, 191 F.3d at 334.

The government argues otherwise, that "[t]hese [commingling] instructions were relevant to Avenatti's intent." Gov. Br. at 27. After rattling off other financial duties related to the prohibition against commingling funds (*i.e.*, promptly notifying a client of receipt of funds; promptly providing information; not withdrawing disputed funds), it then proceeds to list a string of trial facts that, it claims, prove that Avenatti violated these prohibitions. Gov. Br. at 26-27. According to the government, the "dissonance" between Avenatti's alleged actions and the duties he owed under California professional standards "was probative of his intent and lack of good faith." Gov. Br. at 27. But simply saying something is probative does not make it so. A finding of attorney misbehavior is, essentially, strict liability. The wire fraud statute requires the specific intent to defraud. The government fails to make a logical connection between the two.

And the same is true with every other professional duty submitted to the jury in the charge. This problem – that the jury could find a California ethical rule was broken without any intent at all, let alone

the specific intent to defraud – was common to all of them. *See, e.g.,* SPA.7 ("A lawyer cannot act without the client's authorization"); SPA.8 ("Lawyers are required to keep clients reasonably informed of significant developments . . . , and to respond promptly to reasonable status inquiries of clients"); *id.* ("a lawyer is generally required to put fee agreements with clients in writing"). In this federal criminal trial, Avenatti's compliance or non-compliance with all these state ethical rules was irrelevant to prove the requisite *mens rea.*

The only Second Circuit case upon which the government relies for the proposition that proof of ethical violations may be relevant to prove the specific intent of 18 U.S.C. § 1343 is *United States v. Skelos*, 707 F. App'x 733, 740 (2d Cir. 2017) (summary order). *See* Gov. Br. at 27.  In *Skelos*, the defendant, a state senator, was charged with, *inter alia,* honest services fraud for procuring employment for his son through *quid pro quo* arrangements. *Id.* at 739. At trial, he argued that "his actions were nothing more than the appropriate and well-intentioned efforts of a normal father using personal connections to help his son." *See* Brief for the United States of America 78, *United States v. Skelos,* No. 16-1618 (2d Cir. Jan. 16, 2017), ECF No. 90.

To counter this, the government introduced the testimony of an expert who had personally trained Skelos on state ethics laws regarding this topic, in order to prove he was aware of the extent to which legislators could assist family members and, thus, prove his fraudulent intent. *Id.* at 78-79. Notably, the government disclaimed reliance on whether Skelos actually violated state ethical rules, and only sought to prove his knowledge of them. *Id.* at 80. Indeed, the government even conceded that, "Dean Skelos is charged with violations of *federal* public corruption laws; thus, testimony regarding whether Dean Skelos was or was not in fact guilty of a State crime would be irrelevant." Gov't Letter Mot. 3, *United States v. Skelos,* (S.D.N.Y. Dec. 3, 2015), ECF No. 106 (emphasis in original). Without elucidating these facts or engaging in analysis, the Court held, in a non-precedential, summary order, that the district court did not abuse its discretion in admitting the expert's testimony, as evidence that Skelos "was *aware* of ethics rules was relevant to his intent to defraud." *Skelos*, 707 F. App'x at 740 (emphasis added).

*Skelos*, thus, does not bear the weight the government assigns to it. First, *Skelos* concerned a party's introduction of evidence that the

jury was free to give whatever weight it chose, not a trial judge's instruction that the jury had to accept as controlling law. Moreover, the issue in that case was whether Skelos had knowledge of the relevant ethical rules. But here, Avenatti never claimed he was unaware of the ethical rules and there was no question that he did – after all, he was a prominent, respected attorney. Thus, the stated rationale for admission of the ethics evidence in *Skelos* was not present here. Finally, and critically, the district court here directed the jury to consider whether Avenatti "breached" any obligations, SPA.7, not simply whether he was "aware of" them. *Skelos*, 707 F. App'x at 740. In sum, the issues (and dangers) presented at Avenatti's trial simply were not addressed in *Skelos*.

Briefly citing several out-of-Circuit cases, the government also argues that "proof of a violation of a professional rule may play an evidentiary function in assessing the *mens rea* of a lawyer charged with criminal conduct." *See* Gov. Br. at 29-30 (quoting *United States v. Acevedo*, 882 F.3d 251 (1st Cir. 2018); and citing *United States v. Kellington*, 217 F.3d 1084 (9th Cir. 2000); *United States v. Cavin*, 39

F.3d 1299 (5th Cir. 1994); *United States v. Kelly,* 888 F.2d 732 (11th Cir. 1989)). These cases are of no help to the government.

In *Acevedo*, the First Circuit held that the district court did not abuse its discretion in charging the jury on an ethical rule that the attorney-defendant violated, because it was relevant to the "corrupt" intent required for conviction of obstruction of justice and witness tampering. 882 F.3d at 266. This case is not persuasive or even informative, simply by dint of the different standards of review. In any event, as discussed, the wire fraud statute requires not merely a general "corrupt" intent, as in *Acevedo*, but rather a "specific intent to defraud." And also as discussed, Avenatti's alleged violation of California ethical rules did nothing to prove this specific intent. Again, the jury could have found that he violated these rules despite his good faith. As for *Kellington,* 217 F.3d 1084; *Cavin*, 39 F.3d 1299; and *Kelly,* 888 F.2d 732, these cases are wholly inapposite. Each involved violation of the right to present a defense, *i.e.,* a court's exclusion of testimony regarding the ethical obligations of lawyers that would have supported the defendant. The considerations at issue in those cases are entirely absent here.

In short, the government is incorrect that Avenatti's compliance or non-compliance with California ethics rules was relevant to his intent. Rather, as explained more fully in the opening brief, the only possible relevance of Avenatti's professional duties were for any light they might possibly shed on the scheme to defraud element (as the jury was instructed), specifically as to whether he had made a fraudulent representation. App. Br. at 38-39. And in that regard, it is worth reiterating that Avenatti's proposed instruction – California Rule of Professional Conduct 1.4 (Communications with Clients) in its entirety, absent commentary – would have been a correct statement of the law, *United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004), and avoided all of the prejudice caused by the charge actually given by the district court. See App. Br. at 46-47.

**B. <u>Charging The Jury That The "Misappropriation Of Client Funds Is A Particularly Serious Violation Of A Lawyer's Ethical Duty Of Loyalty" Was Improper Commentary, Not Based On The Law, and Highly Prejudicial.</u>**

Near the very beginning of the professional duties instruction, the district court told the jury that "[t]he misappropriation of client funds is a particularly serious violation of a lawyer's ethical duty of loyalty" (2A.555). In the opening brief, Avenatti explains how this aspect of the

charge was especially prejudicial, for it conveyed an opinion, not neutral law; did not relate to the duty of communication or disclosure; and addressed the ultimate issue at this criminal trial, namely, whether Avenatti had stolen money from Clifford. App. Br. at 44-45.

The government's response is unpersuasive. It contends that "the gravity of an attorney misappropriating a client's money was directly relevant to intent" and "it reflected the seriousness with which attorneys are expected to take the care of client funds, and was therefore relevant to the jury's assessment of Avenatti's *mens rea*." Gov. Br. at 28. The government cites no authority for this proposition. And merely asserting that the "gravity" and "seriousness" of such a breach was "relevant" to intent sheds no light on why, exactly, the government believes this is the case.

The government also claims that this charge did not constitute improper commentary or opinion. Gov. Br. at 28. This argument is puzzling. The court's use of the phrase "particularly serious," comprised of an adjective itself modified by an adverb, most certainly conveys a qualitative judgment. *See* Merriam-Webster Dictionary, available at https://www.merriam-webster.com/dictionary/ (serious: "having

important or dangerous possible consequences" or "excessive or impressive in quality, quantity, extent, or degree"; particularly: "to an unusual degree") (last visited Apr. 19, 2023). At no other place in the final charge did the district court use loaded language such as this to modify or describe any other concept that the jury was supposed to apply. Of course, it is beyond dispute that a judge may explain to a jury the relevance of uncharged bad act evidence. *See* Gov. Br. at 28 (citing *Huddleston v. United States*, 485 U.S. 681, 691 (1988)). But nothing about this rule permits the judge to offer a moral judgment about those alleged bad acts.

Third, the government argues that the court was permitted to include this phrase in the charge because it appears in *McKnight v. State Bar*, 53 Cal. 3d 1025, 1035 (1991). Gov. Br. at 28. *McKnight* was an attorney grievance appeal, and the petitioner attorney claimed that his suspension for misappropriating client funds was excessive. *Id.* In finding the punishment warranted, the Supreme Court of California acknowledged the seriousness of this type of breach, and that it therefore justified the seriousness of the sanction. Whether or not this is an accurate statement of the law, Gov Br. at 28, is beside the point.

This reasoning – concerning attorney grievance punishment – was (a) irrelevant in this federal wire fraud trial, because it related to a civil proceeding; and (b) not a proper subject of the jury's deliberations, inasmuch as it concerned punishment. Put differently, the "seriousness" of an attorney's breach of ethical obligations was wholly irrelevant at this trial, and the jury had no occasion to ponder it. Nor should the court have directed jurors' attention to it, or weighed in on the subject.

Finally, it bears note that the government has no real answer to Avenatti's arguments about the prejudicial impact of this charge. The entire case hinged on whether Avenatti wrongfully took Clifford's money, or whether he did so in good faith. That was the ultimate question the jury had to decide. Given this, the district court was required to maintain and project scrupulous neutrality at all times as to this issue, and endeavor to communicate no judgment, whatsoever, about the charges. *See United States v. Assi*, 748 F.2d 62, 66 (2d Cir. 1984); *United States v. Persico*, 349 F.2d 6, 10 (2d Cir. 1965). The court strayed too far when it conveyed its opinion of the seriousness of the offense for which Avenatti was standing trial. Simply imagine a tax evasion trial in which the court charges the jury that, "Evading your

taxes is a particularly serious crime." Such a charge would never be countenanced. Nor should it be here.

## C. **The Government Attempts to Minimize the Faulty Charge and Characterize It As Harmless, But Fails.**

Lastly, the government gives short shrift to the professional duties charge, its import at Avenatti's trial, and the harmful prejudice it caused as a whole. At the outset, the government says that "the instructions regarding an attorney's duties constituted less than four pages of a thirty-six-page charge." Gov. Br. at 25. Although Avenatti would characterize the charge as closer to five pages of the written instructions (*see* A.501-06), regardless, the government's assertion actually proves the point. In a final instruction that totals 36 pages, four to five pages on any one topic is significant.

To compare, the instructions on such fundamental criminal concepts as the burden of proof, reasonable doubt, and the presumption of innocence comprise only a little more than one page, combined. A.485-86. The explanation of Avenatti's good faith defense was less than a page. A.510-11. The aggravated identity theft count, in its entirety, took up only two pages. A.507-09. And, consider the comparative length of the instructions for the wire fraud count. In total,

this count takes up approximately eleven pages of written instruction. A.497-507. Of this, six pages are devoted to the elements of the crime, A.497-501, 506-07; the remaining five pages comprise the professional duties charge. A.501-06. In other words, *nearly half* of the wire fraud instruction was devoted to a detailed compilation of irrelevant California Rules of Professional Conduct. Given this, the instruction played an outsize role at the trial. The jury could not have possibly been immune to it, given its detailed nature and prominence in the final charge as a whole, not to mention the judge's emphasis on the violation one of those rules as "particularly serious."

Nevertheless, the government argues that the judge's error in submitting this charge to the jury was harmless. Gov. Br. at 31-32. What the government misses when arguing that the proof was overwhelming is that Avenatti proffered a good faith defense as to the wire fraud count, *i.e.,* that he:

> . . . had a good faith belief that he was legally entitled to take some of Ms. Clifford's book proceeds (1) as a reasonable fee for his work in obtaining the book deal; (2) as compensation for his and his law firm's work as her attorney; and (3) as reimbursement for costs he advanced for her or incurred for her benefit.

A.510. This defense was well-supported by the testimony and evidence adduced at trial, including the retainer agreement's inclusion of a clause concerning Clifford paying Avenatti if he assisted with a book deal; and the financial accounting that Clifford demanded, and accepted, showing that, as of November 30, 2018, four attorneys of Avenatti's firm had worked 2,381 hours on 10 matters for Clifford, totaling $1,638,390 at standard hourly rates, and the firm had incurred $635,434.18 of out-of-pocket expenses.

The government was required to prove fraudulent intent, and thus disprove this good faith defense, beyond a reasonable doubt. A.500. Against this backdrop, any jury finding of attorney misconduct – however irrelevant – served to immeasurably undermine the defense. And that is precisely what the erroneous charge allowed the jury to do, for it confused the issues and turned the criminal trial into an attorney grievance proceeding. *See United States v. Kopstein,* 759 F.3d 168, 173 (2d Cir. 2014) (a charge that causes "juror confusion is almost certainly not harmless if it pertains to a defendant's 'only' or 'primary' defense").

Finally, the jury deliberated over the course of three days, indicated deadlock and impasse twice, and received two *Allen*-type

charges. *See* Point II, *infra*. In short, this certainly was not the open-and-shut case the government portrays it to be. *See United States v. Jean-Baptiste*, 166 F.3d 102, 109 (2d Cir. 1999) ("The fact that a jury initially was deadlocked and reached a verdict only after receiving an *Allen* charge may support an inference that the case was close."); *United States v. Quiroz*, 13 F.3d 505, 513 (2d Cir. 1993) (error not harmless where a guilty verdict resulted after three days of deliberations and *Allen* charge), *reh'g granted in part on other grounds, denied in part*, 22 F.3d 489 (2d Cir.1994).

Accordingly, for the reasons set forth herein and in the opening brief, vacatur and remand of both counts is required.

## II. The Court's Supplemental Instruction In Response to the Jury's Second Declaration of Deadlock, Which Singled Out the Holdout Juror and Insisted That a Verdict Be Returned, Was Impermissibly Coercive.

The jury here reported deadlock early in deliberations. Nevertheless, it soldiered on after the district court issued a modified *Allen* charge, and continued to deliberate and request evidence and reinstruction. But the deadlock persisted, ultimately leading to a note complaining of a holdout juror. The court's response to this note,

Avenatti contends in the opening brief, was impermissibly coercive. App. Br. at 49-57.

The government disputes that the juror was a holdout at all, instead characterizing her as refusing to deliberate. But the timeline is clear: all jurors had engaged in good faith deliberation over the course of several days, and the only conclusion to be drawn from the record is that the complained-of juror had simply made up her mind as to the verdict. The government also focuses on certain, discrete aspects of the charge that this Court has upheld in other cases. Its arguments miss the broader point; in the context of this case and viewed in totality, the district court's supplemental instruction singled-out the holdout juror and coerced her into abandoning her doubts.

## A. The Record Does Not Show That The Juror Refused To Deliberate.

In its response, the government claims that the juror at issue was not actually a holdout, but rather was engaging in "misconduct" by refusing to deliberate, thus justifying the coercive charge. Gov. Br. at 39, 42. The record belies this claim.

The timeline of deliberations is informative:

- **First day**: Deliberations began at 2:48 p.m. (2A.563 (T.1772)) and ceased at 5:00 p.m. (2A.562 (T.1770)). No notes were sent out that afternoon.

- **Morning of the second day:** The jury began deliberating at 9:00 a.m. or earlier (2A.562 (T.1770). It sent a note at 10:37 a.m., reporting being "unable to come to a consensus on Count 1" and asking for assistance (SPA.41). The court gave a modified *Allen* charge at 11:17 a.m. that encouraged jurors to continue deliberating (SPA.45).

- **Afternoon of the second day:** At 2:10 p.m., the jury sent a note asking for Clifford's testimony in full, and for the court to define "good faith." (SPA.42). The transcript was provided and, at 3:21 p.m., the court recharged the jury on the good faith defense (SPA.46). No further notes were sent. Deliberations ceased at 5:00 p.m. (A.571 (T.1805)).

- **Morning of the third day:** Deliberations began at 8:45 - 9:00 a.m. or earlier (A.571 (T.1805)). At 10:02 a.m., the jury sent the note at issue, calling out the lone juror (SPA.43). At 11:55 a.m., the court provided the challenged instruction (SPA.47).

- **Afternoon of the third day:** The jury announced it had a verdict at 2:33 p.m. (SPA48).

This schedule makes several observations crystal clear. First, jurors engaged in deliberations on the first afternoon and the morning of the second day, as no notes were sent and they reported a classic deadlock ("unable to come to a consensus") that morning. Second, after being charged to continue deliberating, the jurors did, indeed, deliberate on the second day, since they requested substantive evidence

and re-instruction. And third, jurors experienced division about the mail fraud count from early on, a division that they genuinely explored together by requesting evidence and a jury charge directly pertaining to it.

At the time of the 10:02 a.m. note on the third day, therefore, all jurors had been deliberating and considering evidence together for several days, even in the face of at least one disagreement about the mail fraud count. This is precisely what Avenatti pointed out, that "this note cannot be read in isolation" and it was "obvious the jury is deadlocked," as "[t]here were no complaints made relating to this juror at any point in time prior to this morning. We can . . . infer that this juror obviously has deliberated for two days now, and she has reached a conclusion. She doesn't have to explain that conclusion to anyone" (3A.577 (T.1821).

The government accuses Avenatti of "ignor[ing] the circumstances that led to the instruction and the discretion afforded to Judge Furman in addressing allegations of juror misconduct." Gov. Br. at 42. This is not a misconduct case. It is the government who turns this record on its head by suggesting that Avenatti's case is akin to *United States v.*

*Baker*, 262 F.3d 124 (2d Cir. 2001). In *Baker*, "one half hour after the jury retired" a juror refused to participate in deliberations. *Id.* at 131. Within hours, the foreperson sent three strongly-worded notes complaining of her, and the juror herself admitted that she walked into deliberations having made up her mind. *Id.* at 128, 131. This Court held that the juror was properly "removed for her admitted refusal to perform her duty as a juror by deliberating together with the other jurors." *Id.* at 131.

By contrast, here, there was ample evidence of true, evidence-based deliberation right from the start. Simply put, *Baker* is wholly inapposite.[2] And for this reason, the government's repeated references to the law and facts of *Baker* to support affirmance ring hollow. Gov. Br. at 37, 42-44.

---

[2] Contrary to the government's assertion, the district court did not issue a finding in this regard. Gov. Br. at 34. On the one hand, the court stated, "this implicates squarely the circumstances in *Baker*" (3A.578 (T.1824). On the other hand, it noted that it was not sure whether "it's a refusal to deliberate, as the note suggests, versus a conscientious belief that the evidence supports the conclusion that she has reached" (3A.576 (T.1819); *see also* 3A.576-77 (T.1818-20) (distinguishing facts of *Baker*)).

Nor is this conclusion belied by the fact that the note accused the holdout of "acting on a feeling," "[n]ot going on any evidence, all emotions," and "does not understand this job of a jury" (SPA.43). As the Ninth Circuit recently observed, in the "tinderbox of the jury room, . . . frayed nerves and passionate views can cause persons of good faith to doubt the sincerity of those with whom they disagree." *United States v. Litwin*, 972 F.3d 1155, 1170 (9th Cir. 2020). Importantly, the note also complained that the juror "does not believe she needs to prove *her side* using evidence and refuses to show us how has come to *her conclusion*" (SPA.43) (emphasis added). That the juror had a "side" or "conclusion" indicated *not* that the juror refused to deliberate, as in *Baker*, but that she had indeed considered the facts in light of the charge, and had told other jurors of her determination. *Id*. at 1175-76 (noting that complaint about juror actually showed "some amount of discussion").

In the end, the question was whether "[i]f a juror has reached a decision, at what point is potential unwillingness to alter that position a failure to deliberate as opposed to a reflection of the juror's sincerely held view of the evidence presented?" *Id*. at 1170. The answer here, as Avenatti argued, was the latter: in light of the deliberations as a whole,

it was plain that the juror was not refusing to deliberate but rather, had come to a firmly-held conclusion that she was not willing to change. Given that days of deliberations and another announcement of deadlock had preceded this, she was not required to. Nor was she obligated to "prove her side" – especially if she was holding out for acquittal.

## B. <u>The Government Fails To Evaluate The Overall Effect Of The Coercive Charge, Given The Context And Circumstances.</u>

The government concedes that whether a supplemental charge is coercive requires an "individualized assessment," that evaluates the instruction "in its context and under all the circumstances." Gov. Br. at 38 (quoting *United States v. Crispo*, 306 F.3d 71, 77 (2d Cir. 2002)). Because it does not apply this well-settled law to the charge at issue, however, its arguments for affirmance are unpersuasive.

Here, as discussed, the district court was confronted with a jury that had diligently deliberated over the course of several days yet was unable to find unanimity. During that time, the jury had requested not only the most critical evidence, but also reinstruction on the most important issue at trial. Moreover, after having reported one deadlock and received an *Allen* charge, the jury had engaged – again – in good faith deliberation. Despite all this, the impasse continued, eventually

ending up with one juror firmly sticking to her guns, despite what appeared to be days of discussion with fellow jurors.   Undoubtedly, emotions were high in the jury room at this juncture. This is the "context" in which the district court received the foreperson's note complaining about the holdout juror.

At this delicate time, the court was obligated to either tread very carefully in responding to the jury, or else declare a mistrial. Unfortunately, that is not what occurred. After refusing to declare a mistrial or recharge the jury as Avenatti requested, the district court instead issued a supplemental charge that targeted and singled-out the holdout juror. As discussed in the opening brief, App. Br. at 56-57, an entire paragraph of the charge concerned "sympathy or emotion," woven in with the court's admonitions to the jury to "arrive at a just verdict." Moreover, the court concluded the charge by telling the jury to send another note if anyone was refusing to deliberate. This charge, viewed in totality, was obviously directed at the complained-about holdout. "[U]nder all these circumstances," *Crispo*, 306 F.3d at 77, and from the "viewpoint of a juror in the minority position," *Smalls v. Batista*, 191 F.3d 272, 280–81 (2d Cir. 1999), the supplemental instruction "tend[ed]

to coerce undecided jurors into reaching a verdict." *United States v. McDonald,* 759 F.3d 220, 223 (2d Cir. 2014).

The government attempts to pick apart the instruction into small component pieces. For example, it notes that the court told jurors not to surrender their honest convictions. Gov. Br. at 39-40. Avenatti does not dispute that this was what the court said; rather, he contends that the charge, viewed in its totality and given the course of deliberations, was, nonetheless, coercive. Or, the government argues, the jury here received a "modified" *Allen* charge, which is considered less coercive than the "traditional" *Allen* charge, contrasting the majority and minority positions, and which continues to be approved. Gov. Br. at 44. But the fact that a charge has been approved in the past is not a blank check. This Court has "reiterate[d] that a traditional *Allen* charge is a powerful tool that should be deployed only with great caution. . . . [G]iving a traditional *Allen* charge heightens the risk that a juror will feel coerced." *United States v. Vargas-Cordon*, 733 F.3d 366, 379 (2d Cir. 2013). Because the charge here singled-out the sole holdout juror and thereby pitted her against eleven of her peers, and given all the

circumstances, as discussed, the district court abused its discretion in deploying it.

Finally, the government also points to the fact that the jury did not immediately return a verdict after the coercive charge. Gov. Br. at 41-42. As the government acknowledges, however, lunch was served after the court issued the supplemental charge (which was administered beginning at 11:55 a.m.). And due to social distancing constraints, the jurors were not permitted to deliberate during lunch (A.579 (T.1828)). So the actual amount of time the jury had to confer before the verdict was returned was much shorter than two-and-one-half hours. This is a more compressed time period than other intervals cited by this Court as demonstrative of lack of coercion, especially in light of the hours of deliberation that had preceded it. *See, e.g., United States v. Baldeo*, 615 F. App'x 26, 27 (2d Cir. 2015) (five-and-one-half hours); *Vargas-Cordon*, 733 F.3d at 379 (four hours, which was four times the length of deliberations at that point).

In the end, the problem with the government's arguments is that they mistake the forest for the trees. Certainly, some aspects of the charge were less coercive than others. But given that this was the

second deadlock, that the jury had engaged in genuine deliberation over multiple days, and the final note indicating that the holdout would not change her mind, the sum total of the charge – all of its constituent portions, added up together in the context of this case – equaled coercion.

In closing, because the court's instruction "tend[ed] to coerce undecided jurors into reaching a verdict," *Crispo*, 306 F.3d at 77, it was an abuse of discretion. Remand is required.

## III. Appellant Withdraws the Sentencing Argument Concerning Loss Amount.

By letter dated April 21, 2023, appellant respectfully withdraws the argument that "the district court erred in determining that the loss amount was $297,500 because the second book payment of $148,750 was returned and because the loss amount should have been reduced by the value of services Avenatti rendered to Clifford," set forth at pp. 58 through 68 of the opening brief.

## IV. The Restitution Order Must Be Corrected to Conform to the Court's Oral Sentence and Written Judgment.

The government argues that Avenatti waived objection to the erroneous restitution order imposed in this case. Gov. Br. at 46. This argument is incorrect. "[W]aiver is the 'intentional relinquishment or abandonment of a known right.'" *United States v. Olano*, 507 U.S. 725, 733 (1993) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). As this Court has explained,

> If a party's failure to [object] is simply a matter of oversight, then such oversight qualifies as a correctable "forfeiture" for the purposes of plain error analysis. If, however, the party consciously refrains from objecting as a tactical matter, then that action constitutes a true "waiver," which will negate even plain error review.

*United States v. Yu-Leung*, 51 F.3d 1116, 1122 (2d Cir. 1995).

The district court's imposition of a restitution order that differed from its oral sentence and written judgment obviously was a clerical error, the product of "oversight." *Id. See* App. Br. at 69-70. The order itself contains no rationale or reason for departing from the court's sentence. Nor did the government object at sentencing to the defense request that the restitution Judge Gardephe imposed in the Nike case, which was the first case to proceed to judgment, be satisfied first

29

(A.641) ("I don't think we have a position on this request"). It is clear, then, that the erroneous September 23, 2022, restitution order is not what the parties and district court contemplated or intended.

Moreover, there is no conceivable "tactical" reason Avenatti would have refrained from objecting. *Cf. United States v. Forrest*, 571 F. App'x 48, 49 (2d Cir. 2014) (summary order) (defendant waived challenge to restitution order through "tactical decision to accept responsibility for paying restitution to a victim of his crime as part of a conscious attempt to seek leniency at sentencing"). Avenatti thus did not waive this argument.

For the same reasons, *United States v. Kyles*, 601 F.3d 78 (2d Cir. 2010), is not controlling. *Kyles* concerned a district court's intentional post-judgment modification of the restitution schedule. By contrast, it is plain here that the change in the restitution order was the result of error and mistake. Moreover, inasmuch as the change concerned the priority of the two court orders at issue – the restitution order entered by Judge Gardephe vs. the one entered by Judge Furman – this was not a mere schedule-of-payments issue, as in *Kyles*.

Accordingly, this Court should remand to the district court with directions that the September 23 restitution order – intended to be "nothing more than mere evidence of the sentence imposed orally in court by the judge," *United States v. Thomas*, 299 F.3d 150, 152 (2d Cir. 2002) – be conformed to the sentence orally imposed.

## CONCLUSION

For the foregoing reasons and those stated in the opening brief, Avenatti's convictions should be vacated and a new trial ordered; or the case remanded for the court to enter an amended restitution order.

Dated:    New York, New York
          April 21, 2023

                    Respectfully submitted,


                    _____/s/_____
                    Kendra L. Hutchinson
                    Federal Defenders of New York, Inc.
                        Appeals Bureau
                    52 Duane Street, 10th Floor
                    New York, NY 10007
                    (212) 417-8731
                    kendra_hutchinson@fd.org
                    *Counsel for Michael Avenatti*

## CERTIFICATE OF SERVICE

I certify that I have caused a copy of this Brief to be filed with the Court's CM/ECF system, which will effect service on all counsel of record.

Dated: New York, New York
April 21, 2023

_____/s/_____
**KENDRA L. HUTCHINSON**

## CERTIFICATE OF COMPLIANCE

1. This Brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(i) and 32(e), and Local Rule 32(a)(4)(A) because:

> this Brief contains 6,239 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and

2. This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type style requirements of Fed. R. App. P. 32(a)(6) because:

> this Brief has been prepared in a proportionally spaced typeface using Microsoft Word with 14 characters per inch in Century Schoolbook type style.

Dated:     New York, New York
           April 21, 2023

_____/s/_____

**KENDRA L. HUTCHINSON**